| 187  | 389  |
|------|------|
| 204  | ³530 |
| 204  | ᵇ530 |
| 187  | 389  |
| 211  | 77   |
| 187  | 389  |
| s217 | ¹128 |
| 187  | 389  |
| i224 | ³5C2 |
| 37SC³32⁵ | |

Meta N. Bruner *v.* Elizabeth Finley and Thomas Finley, executors of the estate of Thomas Finley, deceased, and Elizabeth Finley, Thomas Finley, Charles C. Vandyke and Elizabeth Vandyke, his wife, William Moffett, and Isabella F. Moffett, his wife, Charles W. Finley, William E. Finley, Thomas Mulqueen, Mary Mulqueen, James S. Barron, Jr., and Elizabeth F. Barron, Appellants.

*Trusts and trustees—Purchase by trustee at his own sale.*

Trustees and others acting under authority conferred upon them for the benefit of others are restrained or incapacitated from buying absolutely for themselves only so long as the trust or the authority in regard to the property sold continues to exist, and until notice is given of its having terminated, especially where the trustee divests himself of the trust or authority by his own act, to those beneficially interested in the property.

Although the rule which disqualifies a trustee from purchasing at his own sale is inflexible, yet it does not apply where the sale is made by a public officer under proceedings adverse to the interest of the cestui que trust, and the trustee has not the means in his power to prevent the sale.

*Trusts and trustees—Purchase by trustee at his own sale—Laches.*

Lapse of time is no bar to the assertion of a direct trust, although it is to a constructive one. Yet where there has been a distinct repudiation by the trustee of even a direct trust, and knowledge of the repudiation has been brought home to the cestui que trust, the case comes within the ordinary rules of limitation and laches.

If a trustee to sell becomes a purchaser his purchase is generally voidable but the cestui que trust must move to avoid it within a reasonable time.

On a bill in equity filed by A against the executors of C for a conveyance of land and for an account, it appeared that A's father and brothers owned the land in question, which was subject to incumbrances. After the death of A's father the land was sold by the sheriff to D. Subsequently D sold it to C for about $16,000. C, in purchasing the property from D, stipulated that he was not to be personally liable for the mortgages which were to remain upon it. About a month prior to the purchase of the land C had entered into a written agreement with A, in which it was mentioned that A claimed an interest in the land, and that C should buy it, but that he should have absolute discretion to pay or to refuse to pay the principal or the interest of the mortgages, and that he should not be accountable for the management of the property, but that if all of his disbursements and advancements should be paid to him in full he should convey the land to A. C died after having paid the interest for

several years. After his death his executors, being without funds, notified A that they could not pay the interest on the mortgages, and called upon her to protect her interest, and subsequently notified her of a sheriff's sale which was to take place under one of the mortgages. A, however, did not pay the interest, and did not do anything in the matter. At the sheriff's sale the executors bought in the property to protect the interest of the estate. Subsequently they placed valuable improvements on the land. A made no adverse claim for fifteen years, and then filed her bill for a conveyance and an account. *Held*, (1) that under the circumstances the executors had a right to buy the property to protect the estate; (2) that until C and his executors were recouped for advancements no trust relation existed between them and A; (3) that even if there had been a constructive trust, or a direct trust, in favor of A, the act of the executors in not paying the interest on the mortgage, and in calling upon A to protect her interest, was a repudiation of the trust which, having been acquiesced in for fifteen years, barred A from enforcing it; (4) that under every aspect of the case A was barred by laches.

Argued Jan. 7, 1898. Appeal, No. 239, Jan. T., 1897, by defendants, from decree of C. P. No. 3, Phila. Co., Sept. T., 1896, No. 114, on bill in equity. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity for a conveyance and an account. Before Mc-MICHAEL, J.

The bill was filed in 1896 against the executors and heirs of Thomas Finley, who died October 24, 1879, to obtain an accounting and a conveyance concerning five properties situate in Philadelphia, to which the decedent had title, alleging that they were affected by a trust in plaintiff's favor, created by said decedent in his lifetime. Said properties, as numbered in the bill, are as follows: No. 1. Northeast corner Thirty-sixth and Spring Garden streets; No. 2. Southwest corner Thirty-sixth and Spring Garden streets; No. 3. Crescentville Mill Property; Twenty-second and Twenty-third wards; No. 4. Northwest corner Thirty-fifth and Spring Garden streets; No. 5. South side Spring Garden street, 100 feet west from Thirty-sixth street.

The bill averred that Nos. 1, 2 and 3 belonged to plaintiff's mother, and that upon her death in 1886, intestate, the plaintiff acquired a one-sixth interest in common with her five brothers, subject to the life estate of her father, James P. Bruner; that she had no interest originally in properties Nos. 4 and 5, which

belonged solely to her father; that in order to protect Edward Browning and the firm of Browning Brothers, to whom they were indebted, James P. Bruner and his sons agreed that said Browning should acquire their title and interest and that of complainant in said real estate, and that he should hold the same in trust, and after paying the indebtedness due to him and his firm out of rents and proceeds of sales, etc., should pay over to plaintiff any surplus in cash, and convey to her any properties that might then remain unsold; that in 1877, in pursuance of such agreement, the title and interest of the father and sons were sold at sheriff's sale under judgments held by Browning against them and bought in by Browning, and the plaintiff conveyed her one-sixth interest in the three properties to him.

The bill averred that subsequently Browning agreed to convey the properties to Finley in consideration of the payment by Finley of the balance of the indebtedness of James P. Bruner & Sons due to him, Browning, upon the trusts thereinafter mentioned, and that·Browning did so convey by deed dated February 19, 1878; that Finley, by agreement dated January 22, 1878, agreed with plaintiff that out of rents and proceeds of mortgages and sales he should first repay himself the moneys advanced by him, to pay the balance due Browning and all taxes and expenses incurred in managing the properties, as well as certain sums due him by James P. Bruner, and should deduct a commission of ten per cent for the management of the properties, and when payment in full had been made to him, he, Finley, would convey to the plaintiff the properties remaining unsold; that properties Nos. 1 and 5 were sold in Finley's lifetime, the first at sheriff's sale under a mortgage made by Browning, and the other by Finley for a nominal consideration, subject to a mortgage of $10,000, also made by Browning, and that Nos. 2, 3 and 4 were sold after Finley's death at sheriff's sale under foreclosure proceedings on mortgages.

It was further averred that property No. 5 was sold in fraud of plaintiff's rights, because of inadequacy of price, and that the purchase by the executors of Nos. 2 and 3 was in trust for her, under the said written agreement made with Thomas Finley, the decedent, and that the same should be conveyed to her by the executors, and that there is a balance due for which the defendants should account to her. She asks for an accounting of all five properties.

Defendants' answer admitted the facts set forth with reference to the original title to the properties, but denied that the alleged written agreement was made by Thomas Finley, but avers that Finley was the sole and absolute owner of said properties which were not subject to any trust in favor of the plaintiff; that the executors purchased the two properties, of which a conveyance and accounting are sought, at sheriff's sale in 1881, under adverse proceedings on mortgages thereon in order to protect their decedent's bond, and that the plaintiff never made any claim of interest in said properties from the time they were sold in 1881 up to 1896, during which time the executors had expended large sums in improving said properties.

It averred that James P. Bruner and his sons in 1877 were insolvent, and that Edward Browning and Browning Brothers held judgments against them under which the interest of the Bruners in the properties was sold and bought in by Browning; that plaintiff conveyed her interest in the properties to Browning in order to pay the indebtedness of her father and brothers; that there was no agreement by which Browning was to hold the properties in trust, but that his conveyance from the sheriff and the plaintiff was an absolute title, not subject to any trust in favor of the plaintiff; that Browning did not agree to convey the properties to Finley upon any trust in favor of complainant; that the only agreement under which Browning sold the properties to Finley was an agreement to sell absolutely to Finley for the consideration of upwards of $16,000, and no mention was made of the plaintiff's name or of any trust in her favor; that the deed by Browning to Finley, dated February 19, 1878, in pursuance to this agreement, was likewise absolute on its face; that plaintiff signed a paper dated January 22, 1878, but this was never signed by Finley, and Finley never agreed to hold the properties in trust for plaintiff; that the properties sold at sheriff's sale were sold under adverse process on the mortgages, of which plaintiff had full and ample notice; that the executors were unable to carry the properties any longer, and under advice of counsel declined to pay interest, and notified plaintiff that she could have a conveyance of the properties upon payment of upwards of $20,000, which was the amount expended on them by the decedent and the executors, who submitted an itemized account thereof; that plaintiff knew of the

sheriff's sales to the executors of Thomes Finley at the time they took place, but made no claim of interest under the trust or otherwise for fifteen years thereafter, and until shortly before this suit was brought.

The facts as developed at the trial appear by the opinion of the Supreme Court.

The court below entered a decree directing an account.

*Error assigned* among others was the decree of the court.

*James Aylward Develin* and *John G. Johnson*, for appellants. —No written agreement of trust was proved to have been executed and delivered within the statute of frauds: Porter v. Wilson, 13 Pa. 641; Slaymaker v. Wilson, 1 Penrose & Watts, 216; Laubach v. Meyers, 147 Pa. 452; Burr v. Kase, 168 Pa. 91; Krise v. Neason, 66 Pa. 253; Kerns v. Swope, 2 Watts, 75; Smith v. Smith, 27 Pa. 180; Williard v. Williard, 56 Pa. 125; Fox v. Heffner, 1 W. & S. 372; Barry v. Hill, 166 Pa. 344; Pringle v. Pringle, 59 Pa. 281, and under the terms of the alleged agreement the defendants would not be liable.

The title to the real estate did not descend to the executors, hence they were not on any theory trustees for the plaintiff, and they owed no duty to her: Jenks v. Backhouse, 1 Binney, 91; Schenck v. Schenck, 16 N. J. Eq. 182; Zabriskie v. Morris, etc., R. R., 6 Stewart (N. J.), 22; Lockman v. Reilly, 95 N. Y. 64.

The title was derived from the sheriff's sale under adverse proceedings, and even if the executors had stood in a fiduciary capacity the purchase by them would not have been subject to any trust: Fisk v. Sarber, 6 W. & S. 18; Chorpenning's App., 32 Pa. 315; Patterson v. Lennig, 118 Pa. 571; Twin Lick Oil Co. v. Marbury, 91 U. S. 590; Allen v. Gillette, 127 U. S. 589.

The title derived from the executors through the sheriff's sale is at most voidable, not void, and any trust relation by the executors toward the plaintiff with respect to the property so purchased, can arise only by legal implication, and such trust is then within the operation of section 6, act of April 22, 1856: 1 Pepper & Lewis Dig. 2683; Fisk v. Sarber, 6 W. & S. 18; Christy v. Sill, 95 Pa. 380; McKean v. Clay, 149 Pa. 277; Way v. Hooton, 156 Pa. 8; Hollinshead's App., 103 Pa. 158; Silliman v. Haas, 151 Pa. 52; Barry v. Hill, 166 Pa. 344.

394    BRUNER *v.* FINLEY.

Plaintiff has been guilty of gross laches in remaining silent for fifteen years before making her claim: Penna. R. R. Co.'s App., 125 Pa. 203; Ashhurst's App., 60 Pa. 290; Graham v. Donaldson, 5 Watts, 451; Norris v. Haggin, 136 U. S. 386; Baker v. Read, 18 Beaven, 398; Roberts v. Tunstall, 4 Hare, 257; Twin Lick Oil Co. v. Marbury, 91 U. S. 587; Rich v. Black, 173 Pa. 92; Bauer's Estate, 30 W. N. C. 429; Stryker's Est., 17 Phila. 507.

*F. Carroll Brewster*, for appellee.—The Supreme Court will not reverse if the findings are based upon evidence sufficient to submit to a jury: Warner v. Hare, 154 Pa. 548; Brotherton v. Reynolds, 164 Pa. 134; Railway v. Railway, 164 Pa. 274.

If the necessities of her case so required, the appellee might well contend that the appellants are estopped from denying the signature of Thomas Finley: Rhodes v. Frick, 6 Watts, 315; Vanleer's App., 24 Pa. 224; French v. Whitticar, 3 Phila. 51.

Much of the appellants' argument to the effect that a trust of real estate descends to the heir at law would be applicable, were it not for the fact that none of the properties as to which the bill was filed ever passed under Thomas Finley's will. All were sold to strangers, or the title acquired by the appellants outside the will.

A trustee will not be allowed to purchase the trust property at his own sale unless by leave of the court first had, nor in any manner to make a profit out of the same: Patterson v. Lennig, 118 Pa. 571.

The mere lapse of time cannot of itself bar an established legal or equitable right: Salter v. Cavanagh, 1 D. & W. 668; Patrick v. Simpson, L. R. 24 Q. B. D. 128; Nugent v. Nugent, 15 Law Reps. Ireland, 321; Lewin on Trusts, *64; Hovenden v. Annesley, 2 Sch. & Lef. 607; Cox v. Dolman, 2 DeG., M. & G. 592; Atty. Gen. v. Brewers' Co., 1 Mer. 495; Ward v. Arch, 12 Sim. 475; Oliver v. Piatt, 3 How. 411; Pickering v. Lord Stamford, 2 Ves. Jr. 283; Paschall v. Hinderer, 28 Ohio, 580; Shorter v. Smith, 56 Ala. 208; Dickenson v. Holland, 2 Beaven, 310.

OPINION BY MR. JUSTICE GREEN, October 17, 1898:

The title of Browning to the premises in question was ac-

quired by sheriff's sales upon judgments against Bruner and his sons and a conveyance by the plaintiff, whose interest was not bound by the lien of the judgment. The title of Finley was acquired by deed from Browning dated February 19, 1878, and an agreement in writing between them of the same date. Neither in the agreement nor in the deed was any trust of any kind created or mentioned. The paper under which it is alleged the trust in favor of the plaintiff was created is in form an agreement between Meta N. Bruner, the plaintiff, and Thomas Finley, the defendant's testator, dated January 22, 1878. This paper, as given in evidence, bears the signature and the acknowledgment of Meta N. Bruner, but was not signed by Finley, and no paper or copy was put in evidence which did contain his signature. It was claimed by the plaintiff that there was a paper which contained his signature, but it was not discovered after search had been made for it, and it was claimed to be lost. The proof of its execution by Finley is not at all satisfactory, and it is at least doubtful whether the proof respecting it would sustain a recovery if the fate of the case depended upon that instrument. But in the view that we take of the case it is not necessary to engage in the discussion or decision of that question. It is quite certain that both Finley and his executors did recognize some contract relation between him and the plaintiff, and the executors did at a later day furnish an account to the plaintiff, which was given in evidence but is not printed, and we are therefore in ignorance of its contents. It is also certain that the executors did recognize the plaintiff as having an interest of some kind in the property, both by letters addressed to her and to her brother, H. F. Bruner, and by the account submitted and delivered to her, by which it is said there appeared to be a balance of $20,555.39 due upon the property to Finley's estate, and by calling upon her for its payment, and notifying her to protect her interest in the property in March, 1881, at the approaching sheriff's sale which was about to take place. In that notice they said that if she paid the indebtedness she would be entitled to a conveyance. It is altogether probable, therefore, that, whether the written agreement of January 22, 1878, was signed by Finley or not, its terms as there expressed constituted the relation between them. Treating the case then as if this instrument expressed their actual relations, it is neces-

sary to consider what are the merits of the respective conten-
tions of the parties in the present litigation. The plaintiff
contends that she is entitled to an account of all the transac-
tions of Finley and his executors with the property, and the
learned court below has awarded an accounting as to two of
the properties in dispute. As a matter of course she is only
entitled to an account upon the theory that she would be enti-
tled to an interest in the property after the sheriff's sale, and
to an accounting for the moneys received and paid by the exec-
utors after that time. An account was furnished to her of all
the transactions respecting the property up to March 28, 1881,
immediately preceding the sheriff's sale which took place in
May, 1881. The defendants claim that for various reasons she
is not entitled to any such accounting. They contend that she
is disqualified from maintaining any claim against them by rea-
son of her gross laches in failing to prefer any claim or demand
against them for a period of fifteen years after the sheriff's sale,
and they also claim that they had a perfect legal and equitable
right to terminate the trust by the very method in which it was
done. To these contentions the plaintiff responds that the trust
was an express written trust and therefore not subject to the
defense of laches, and that there was no right to determine it
by a sheriff's sale of the property, because the sale was procured
by their own agency and therefore did not relieve them of the
trust. These conflicting contentions are of the most serious
character, and require a very careful consideration. At the
very threshold of the discussion lies the question, what was
the real character of the trust? It is perfectly clear that it was
not a case of a direct conveyance of the property of the grantor
to a trustee to hold it upon the terms of an express trust for
the benefit of the grantor. In such circumstances of course
the trust relation continues indefinitely until it has expired by
its own limitations, and is not subject to the defense of laches or
the statute of limitations. But in this instance Meta N. Bruner
conveyed no property of any kind to Thomas Finley. She gave
him no money, nor anything having any value whatever, with
which to acquire this or any other property. His whole title
was delivered by deed from Edward Browning. As it was
conveyed to him, the property was subject to an immense amount
of liens, aggregating about $55,000, bearing interest, which

somebody must pay, and which neither the plaintiff nor her father or brothers ever did pay. But this is not all. Mr. Finley agreed with Browning to pay, and he did pay about $16,000 of his own money as the consideration of the conveyance by Browning to him, and not a penny of this money ever came from this plaintiff or from her father or her brothers. Nor is this all. The agreement with Browning expressly stipulated as follows, "Thomas Finley buys the Bruner properties, five in number, from Edward Browning for the consideration of about $16,000; it being understood, however, that there are now on the properties mortgages made by Browning to the amount of about $55,000. These mortgages are to remain upon the properties, but Finley is not to assume their payment, or to be liable therefor. The properties however are to remain liable for them." Nor is this all. The agreement of Meta N. Bruner expressly and positively stipulates, "That the said Thomas Finley shall have full and absolute discretion to lease, mortgage and sell, or to abstain from letting, mortgaging and selling, the said five properties or any of them or any part thereof, and shall at his own sole discretion pay, or refuse to pay, interest on the mortgages created by Browning or on any other incumbrances that may now or hereafter exist or be created on the said properties or any of them, or pay or refuse to pay, the principal sums of any such mortgages or other incumbrances. And the said Thomas Finley shall not be in any way liable or accountable for the management of the said properties or any of them, but shall have the full and entire control thereof as fully as if the said Meta N. Bruner did not claim any interest therein."

It will thus be seen that, both under the agreement with Browning and the agreement with the plaintiff, Finley was under no kind of obligation, legal or equitable, to pay any part of the interest or any part of the principal of any of the liens on the properties. He might do it or he might refuse to do it, just as he pleased. But if he was under no such obligation, he violated no duty if he declined to pay either interest or principal, and hence he had a perfect right to refuse to pay either interest or principal at any time he chose to do so, and thus to terminate the trust. Of this right his executors availed themselves when on March 17, 1881, they addressed a written

communication to the plaintiff; and therein notified her that they could no longer continue to pay interest and taxes; that the property would have to be sold under foreclosure proceedings on the $20,000 mortgage, unless she could prevent them, and called upon her to protect her interest and pay the indebtedness on the real estate. This communication they delivered to her in person. But she made no response to it then or ever after. Later, when the suit on the mortgage had been brought, and judgment recovered, and a writ of levari facias for the sale of the property had been issued, they sent a copy of the sheriff's bill of sale to the plaintiff's brother, H. F. Bruner, who had been acting for her, and asked whether he could arrange for the payment of the amount due the estate, and to this letter no answer was received. At the sale the executors attended and bid up the property to an amount sufficient to pay the mortgage and interest, and the property was struck off to them. There was an additional reason for their adopting this course. Their testator, Thomas Finley, had given his personal bond for $20,000 to the holder of the mortgage as an additional security for the debt, and the executors were naturally anxious to discharge this obligation. If Thomas Finley had remained alive he would most certainly have had the right to protect himself in this way, and for a still more convincing reason his executors, with limited powers, and subject to personal liabilities to others interested in the estate of their testator, held the same right. Neither he nor they was subject to any duty to continue paying interest, taxes and expenses incident to the maintenance of such a property for an indefinite time, and thus possibly exhaust the whole, or a considerable part, of his estate. They were not only not bound to any such duty, but they were most positively released and discharged therefrom by the express terms of the very instrument under which alone the plaintiff claims title. It is perfectly clear, therefore, that the trust created by the instrument which was signed by Meta N. Bruner was not a continuing one; that it did not bind Thomas Finley or his executors to pay off any of the liens on the property, or to continue the maintenance of the trust any longer than he or they chose to do so. There were very good reasons why the executors could not, and, therefore, should not continue to make payments either of interest, taxes or expenses for the maintenance of the trust.

They could not do so because they did not have the money. One of the executors, Thomas Finley, being examined as a witness testified: "Q. You went to Mr. Milne (mortgagee's son)? A. I notified him that we would decline to pay any more interest on the properties. It was under the advice of my attorneys. . . . . Q. Was this mortgage overdue? A. Counsel so advised me at the time. Q. And in point of fact you did refuse to pay any more interest? A. Yes, sir. Q. Had you been put in possession of any of the funds by Miss Bruner to pay this interest? A. No, sir. Q. And you had no money then, to pay this interest? A. No, sir."

When the executors bought the property at the sale under the mortgage they had no money to pay for it, and were obliged to borrow the money for that purpose. It was testified also that the executors made out an account of all the moneys received and paid out on account of the estate from March 15, 1878, to March 28, 1881, and gave the same to the Bruners, by which it appeared there was then due to Thomas Finley's estate on account of these properties $20,559.39, no part of which did the Bruners or any of them pay or offer to pay to Finley's executors. Thomas Finley had paid out about $16,000 for the property when he took the conveyance with his own money, and in March, 1881, this indebtedness to him had increased to upwards of $20,000, and there was no apparent limit to its continued increase if the executors continued to make payments. We cannot comprehend how it is possible to hold that there was the least degree of obligation of any kind to continue the maintenance of such a trust. On the contrary it is manifest upon every consideration that it was their clear duty to terminate it at the earliest moment.

There is another reason founded upon the fourth clause of the agreement signed by Meta N. Bruner why she never had any position or right as a cestui que trust under that instrument. That clause provides, " When and as soon as payment in full has been made to said Thomas Finley of the amounts due him for his said advance to said Edward Browning, and for all other disbursements made in the management of said properties, and for the loans due by said James P. Bruner, and for said commissions as hereinbefore stipulated, out of the collections and receipts from rents, mortgages or sales of the said

properties, then the said Thomas Finley shall convey to the said Meta N. Bruner all the right, title and interest of him, the said Thomas Finley, of, in and to such properties as may at that time remain unsold." This is the title set up by the plaintiff, but by its own terms it never could come into existence until Thomas Finley was fully paid for all his advances and claims which the instrument itself recognized. But that time never came. If the plaintiff desired to acquire title to the property as prescribed in the agreement it was her duty to have paid, or at least tendered payment of the amount due to the estate of Finley. But this she never did. She paid nothing at all, nor ever offered to pay anything, hence she could not claim any right or title to a conveyance. It is of no consequence to say that, subsequently, after the sheriff's sale, there may have been enough receipts to pay off the claim of Finley and all other charges. Her duty was to pay or tender the amount due when it was claimed, and she cannot be permitted to wait till after the trust was terminated, and other large sums had been expended upon the property, and many years had passed away and the property had improved in value, and then to come forward and prefer a claim which had no foundation in law or equity, at a time when it was her duty both at law and in equity to bring herself within the operative words of her agreement. These considerations appear to us to be of overwhelming weight against the plaintiff's claim, when it is considered that Thomas Finley's engagement to buy the property from Browning for $16,000 in cash, subject to $55,000 of mortgages, was a sheer gratuity on his part. Without one penny received from any of the Bruners, and done merely as an act of friendship for them, he and his executors continued to pay out money for the Bruners until in three years' time the amount had increased to $20,555.39, and still no prospect of any return; and when, upon demand, made in a perfectly legitimate manner for reimbursement for his outlay and no response was made thereto, and then the property was sold upon proceedings upon a prior lien, which also the Bruners, including the plaintiff, never paid or offered to pay, and Finley was under no duty to pay, and when they were fully apprised of the sale and made no bids for the property or took the least step for its protection, it is simply impossible to discover the least equity in the plaintiff's

claim to entitle her to any account or to any decree of any kind against these defendants.

We are clearly of opinion that the defense of laches is entirely available in the circumstances of this case. There was no trust of any kind in favor of the plaintiff until and unless the Finley estate was fully recouped for the whole of its outlay, and that time never arrived. The trust, such as it was, was lawfully terminated by the executors refusing to make any more payments of interest or taxes, and the subsequent sale of the property under a mortgage which Finley was under no duty to pay. There can be no doubt that at such a sale the executors had a right to purchase the property for their own protection. A delay of fifteen years on the part of the plaintiff in setting up a claim under the agreement of January 22, 1878, is gross laches which properly defeats any right of recovery.

In Fisk v. Sarber, 6 W. & S. 18, we said: "A purchase, however, by a trustee is not absolutely void, but voidable merely at the election of the cestui que trust or those beneficially interested in the estate; so that the trustee takes the property subject to the equity of the cestui que trust to call upon him within a reasonable time to account for the profits or have a resale. . . . . But it is also equally well settled in England, as also by our own decisions, that trustees and others acting under authority conferred upon them for the benefit of others are only restrained or incapacitated from buying absolutely for themselves as long as the trust or the authority in regard to the property sold continues to exist, and until notice is given of its having terminated, especially where the trustee divests himself of the trust or authority by his own act, to those beneficially interested in the property."

This citation is peculiarly applicable to the facts of this case. It must be remembered that Thomas Finley was not a technical trustee at all. Moreover he had a private and personal interest in the property on account of his having paid his own money for it, and he had also a right to full recoupment for all his outlay, before any possible relation of trustee arose. If he was not fully recouped he was not a trustee at all. He was subject to no duty to pay any of the liens nor any interest on them. He had also a right to protect himself against loss by purchasing the property for his own interest. He demanded reimburse-

ment from the plaintiff and she did not give it to him or offer
to do so. That being the situation the trust did not arise, and
he had a prior right to protect himself. In such circumstances
his right to purchase at a judicial sale upon a lien to which he was
not a party, and under no duty to pay, and after notice of the
sale given to the plaintiff, and demand made and refused for his
reimbursement cannot be questioned. In Chorpenning's Ap-
peal, 32 Pa. 315, we held that although the rule which disquali-
fies a trustee from purchasing at his own sale is inflexible, yet
it does not apply where the sale is made by a public officer under
proceedings adverse to the interest of the cestui que trust, and
the trustee has not the means in his power to prevent the sale.
Therefore a guardian, without funds in his hands, may law-
fully become the purchaser for his own use of his ward's real
estate, sold by the sheriff under a judgment against the personal
representative of the ward's ancestor.

There is no question as to the principle decided by these
cases. Fisk v. Sarber is a leading case constantly affirmed and
applied wherever the facts require it.

As to the laches of the plaintiff the authorities are equally
clear. In Graham v. Donaldson, 5 Watts, 451, a plaintiff in
an execution purchased the defendant's land at sheriff's sale
upon an agreement that he would reconvey the same to the
defendant upon the payment of his judgment; the defendant
did not act in relation to it for ten years. During this time
the purchaser took possession of the land and made valuable
improvements upon it and died in possession. It was held that
the cestui que trust could not recover. SERGEANT, J., deliv-
ering the opinion, said, " Surely such contracts must be under-
stood as being intended to be performed within a short period
—within a few years—when the circumstances are recent—be-
fore any very great change has occurred, and when the advan-
tages of the parties continue mutual. . . . It is unnecessary,
therefore, to enter into the question of tender, because we are
of opinion that even if the plaintiff had tendered in due season
the moneys due, and the full value of the permanent improve-
ments placed on the land (which at least he would have been
equitably bound to do), yet the charge of the court and verdict
must have been for the defendant, on the ground that, under
all the circumstances of the case, the plaintiff had no equity to
take the property from the defendant at so late a period."

In the case at bar the defendants were notified by the board of building inspectors of Philadelphia, in July, 1881, only two months after the sheriff's sale, that they must take down the main factory building of the Crescentville property as being unsafe and dangerous.   The defendants complied with this notice, and had to expend about \$35,000 in rebuilding the plant.   They then carried on a manufacturing business on the premises, and now, after a delay of fifteen years, and a very large sum being expended upon the property in the way of improvements, and a consequent large increase of the value of the property, the plaintiff invokes a court of equity to hold the defendants to account for the rents and profits of the property during that period.   This certainly cannot be done.   In Ashhurst's Appeal, 60 Pa. 290, we said, STRONG, J., " And in all the cases in which an attempt is made to fasten a constructive trust upon a purchaser the attempt must fail unless made in a reasonable time.   Acquiescence is presumed from delay.  Lapse of time, indeed, is no bar to the assertion of a direct trust, but not so when the trust is constructive.   If a trustee to sell becomes a purchaser his purchase is generally voidable, but the cestui que trust must move to avoid it within a reasonable time," citing a number of authorities, particularly Beckford v. Wade, 17 Ves. 87.   Referring to authorities previously cited the opinion proceeds, " They are all sustained by the principle that equity presumes against the existence of a trust unless it be asserted within a reasonable time. . . . But what is the reasonable time within which a constructive trust must be asserted ? The cases do not clearly define it, and perhaps it is incapable of strict definition.   It must vary with the circumstances of each case.   For myself I think, it may safely be laid down that when a party claims to hold another a trustee for personal property under a constructive trust, he must assert the claim within six years from the time when the trust is alleged to have originated.   He cannot be permitted to make the assertion afterwards.   This, I think, should be regarded as the general rule. There may be cases where even six years cannot be allowed, as when a party having a right to set aside a transaction, or treat it as a trust, stands by and sees another dealing with the property in a manner inconsistent with any trust, and makes no objection. . . . And so when the rights of third persons have

intervened. So, also, where the property is of a peculiar kind, and the alleged trustee, in ignorance of any intention to hold him to account, relying upon his ownership, enters upon a hazardous business or incurs large responsibilities."

It is no answer to this case to say that it was a case of constructive trust only, and hence inapplicable here, because this is a case of express trust. It must be remembered that a part, indeed the principal, effort to charge the defendants with a trust was upon the ground that they were purchasers at a sale which they, at least, controlled. A trust which arises in that way is essentially and only a constructive trust. We have heretofore shown that there is no trust of any kind contained in the deed which gave Finley his title, and therefore the title was not clogged with any trust or confidence of any kind. The only other paper which it is claimed established a trust is the agreement signed by Meta N. Bruner. But that paper also creates no trust of any kind until after Finley was fully repaid the whole amount of his outlay. In the absence of such reimbursement there was no obligation to convey the property to Meta N. Bruner, and hence no trust. It follows that as neither Finley nor his executors could be called upon for a conveyance to the plaintiffs, she has no standing to call upon them for an account.

In Pa. R. R. Co.'s Appeal, 125 Pa. 189, we said, "It has been many times held that long delay, and sometimes a delay of even less than six years will be regarded as laches sufficient to stay the intervention of equity." In Norris v. Haggin, 136 U. S. 386, which was a bill by a principal against his agents for obtaining from him, while mentally incompetent, a note for $64,000, and a mortgage on all his real estate to secure its payment, and foreclosed the mortgage and bought the land at their own sale and took the title thereto, the principal was restored to health in 1869, and filed a bill in 1884, it was held by MILLER, J., in the opinion, "That under the averments in the bill the plaintiff's mental incompetency ceased in 1869 and that there were fifteen years of silence and inaction and laches unaccounted for ; that the facts out of which the plaintiff was bound to know that this fraud existed were open, notorious and patent, being matters of record, and could not fail to be discovered by any search and inquiry or investigation." It was held, further, that the laches of fifteen years was sufficient to defeat the plaintiff's claim. In

Roberts v. Tunstall, 4 Hare, 257, fifteen years elapsed from the time the relation of trustee and cestui que trust had ceased before a bill was filed to set aside a sale made by a cestui que trust to his trustee at a great undervaluation, and it was held that the long delay was fatal to any right of recovery. In Twin Lick Oil Co. v. Marbury, 91 U. S. 587, a delay of four years was held too great, in view of the character of the property, to attack a purchase of real estate made by a director of a corporation upon a sale under a deed of trust held by him.

The authorities on this subject are very numerous but it is not necessary to make any further citations.

A kindred subject to the foregoing is the proposition that, even in cases of express trust, if there has been a distinct repudiation of the trust by the trustee, and knowledge of the repudiation has been brought home to the cestui que trust, the case comes within the ordinary rules of limitation and laches. Thus in Swift v. Smith, 25 U. S. C. C. A. Rep. 154, 79 Fed. Rep. 709, it was said: "Another contention of counsel for the appellant is that the record of the deed of the judge of the probate court of Arapahoe county to Nye, the administrator, disclosed an express trust in favor of the appellant; and they cite the principle that neither time nor laches will bar the right to enforce such a trust, because the possession and use of the trust property by the trustee is presumed to be the possession and use of the cestui que trust, and never adverse to him: Speidel v. Henrici, 120 U. S. 377, 386; 7 Sup. Ct. 610; Lemoine v. Dunklin Co., 38 Fed. Rep. 567. The principle is sound but it is subject to the express exception that when the trust is repudiated, and knowledge of the repudiation is brought home to the cestui que trust, the case is brought within the ordinary rules of limitation and laches. The purchase of these lots from Nye, as administrator in 1867, the payment to him by Brown of their full value, Brown's occupation of them as his residence, his improvement of them, the administrator's deed to him in 1869, the subsequent sales and conveyances of them, the payment of taxes upon them, and their improvement of them by the purchasers, were all acts of repudiation of this trust, acts utterly inconsistent with any admission of its existence. The appellant was chargeable, under the law, as soon as she became of age, in 1871, with knowledge of all those acts which

had been done prior to that date ; and upon the same principle she was chargeable with knowledge of the later acts as they occurred. This case, therefore, falls under the exception to the rule, and the inexcusable negligence and delay of the appellant are fatal to her recovery." In Naddo v. Bardon, 4 U. S. Appeals, 642, the same doctrine was announced and enforced. It was there said : "But it is earnestly said by counsel that while laches is often invoked in cases of constructive fraud, it is never accepted as a defense in a case of an express trust and actual fraud, and the leading cases of Michoud v. Girod, 4 How. 503, 561, and Prevost v. Gratz, 6 Wheat. 481, are cited. It is doubtless true that where an express trust is once shown to exist it is presumed to continue, and therefore no lapse of time will defeat an action to enforce rights under it. But when that trust is repudiated, and knowledge of the repudiation is brought home to the cestui que trust, the case is brought within ordinary rules of limitation and laches : Speidel v. Henrici, 120 U. S. 377. Here, as we have seen, the plaintiff alleges that he never knew of the existence of adverse rights ; that his own title was disputed, and that his agent repudiated all obligations more than ten years before he commenced this suit. And the disavowal of the trust was not by indirection, nor was it a mere inference from the conduct of the trustee, but it was direct and unequivocal. He admits that his agent and trustee claimed that he had lost all rights in the property, and refused to account to him, and that he had known this fact for years. Thus he shows a known and distinct repudiation, and one of long standing." In the recent case of Hammond v. Hopkins, 143 U. S. 224, 250, it appears that the trustees purchased, as charged here, through an intermediary at their own sale, and the Supreme Court through the Chief Justice said : "Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights and the like : Marsh v. Whitmore,

21 Wall. 178; Lansdale v. Smith, 106 U. S. 391; Norris v. Haggin, 136 U. S. 386; Mackall v. Casilear, 137 U. S. 556. . . . Undoubtedly the doctrine is established that a trustee cannot purchase or deal in the trust property for his own benefit or on his own behalf, directly or indirectly. But such a purchase is not absolutely void. It is only voidable, and as it may be confirmed by the parties interested directly, so it may be by long acquiescence, or the absence of an election to avoid the conveyance within a reasonable time after the facts come to the knowledge of the cestui que trust." In Story's Equity Jurisprudence, sec. 1520, it is said: "It is often suggested that lapse of time constitutes no bar in cases of trust. But this proposition must be received with its appropriate qualifications. As long as the relation of trustee and cestui que trust is acknowledged to exist between the parties, and the trust is continued, lapse of time can constitute no bar to an account or other proper relief for the cestui que trust. But where this relation is no longer admitted to exist, or time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance; in all such cases, a court of equity will refuse relief upon the ground of lapse of time and its inability to do complete justice. This doctrine will apply even to cases of express trust, and, a fortiori, it will apply with increased strength to cases of implied or constructive trusts."

There is not the slightest difficulty in applying these principles to the facts of the present case. Bearing in mind that Thomas Finley never agreed to pay off the prior incumbrances on the property, principal or interest, and that he was expressly released from any such duty, but nevertheless he did pay interest for a few years, until the burden became too great for his executors to bear, and the fact that they were without funds to do so, it was distinctly proved that they made repeated efforts to have the plaintiff and the other members of her family perform this plain legal duty, they finally called upon her in writing to pay the indebtedness and to protect her interest in the event of proceedings on the $20,000 mortgage; and they also notified her that they could not carry the burden any longer. They also gave her distinct notice of the sheriff's sale, and at the sale they bought in the property in order to protect the interests of

their estate as they had a perfect right to do. All of this was a distinct repudiation of any trust, and when they subsequently took possession of the property, tore down the old factory under municipal notice to do so, and then erected valuable improvements thereon, it was most distinct notice that they were claiming ownership in their own right. And when, after all this, the plaintiff stood by while the defendants were expending all this money and erecting all these improvements, and made no assertion of any right in her to have the property or any account of its rents and profits, and made no adverse claim of any kind for the long period of fifteen years, it is too plain for argument that equity will treat her as having acquiesced in the proceedings and acts of the defendants in their claim of title to the property in question, and in their dissolution of any possible relation of trust or confidence as to this property. And when she never at any time paid or offered to pay any part of the large indebtedness due to Thomas Finley and to his estate, she voluntarily placed herself within the very terms of her agreement which positively excluded her from holding that the relation of trust had ever arisen, or was, then or at any other time, in force as between herself and Thomas Finley or his executors, in relation to this property. We are clearly of opinion that the plaintiff has no possible claim in equity, or at law, against these defendants, and that she is therefore not entitled to any account or other relief.

The decree of the court below is reversed and the plaintiff's bill is dismissed with costs.