**EARLL et al. v. PICKEN.**

**PICKEN v. EARLL et al.**

**Nos. 7297, 7298.**

United States Court of Appeals for the
District of Columbia.

Decided April 15, 1940.

Motion to Modify Decision Denied
May 20, 1940.

Charles A. Douglas, Hugh H. Obear, and Edmund D. Campbell, all of Washington, D. C., for appellants, and cross-appellees Earll and others.

John P. Labofish, of Washington, D. C., for appellee, and cross-appellant Picken.

Before EDGERTON, VINSON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The cross appeals are from a decree of the District Court allowing plaintiff, Harry E. Picken,[1] $3,100 damages against defendants Donald M. Earll and Louise C. Earll 'for breach of trust. The controversy arises from the fact that Donald M. Earll assumed inconsistent positions as trustee for the plaintiff and as owner of adverse interests in the trust property, which he concealed by use of straw men and otherwise. Various transactions flowing out of this situation are challenged,

[1] His wife, Mattie E. Picken, now deceased, was a party plaintiff below.

including a foreclosure of the plaintiff's interests in the property and acquisition of it by the defendants. The facts as found by the trial judge are not disputed in any material aspect and are supported by the evidence in the record. They are substantially as follows:

In September, 1930, plaintiff owned a residence on G Street, Washington, D. C., encumbered by a deed of trust which had been reduced to $1,900. A real estate broker, Lucien H. Thaden, persuaded plaintiff to buy a larger house on Military Road at a price of $13,500. The terms were assumption of a $7,500 first deed of trust, execution of a $4,500 second deed of trust, payable in installments of $65 per month, and $1,500 cash. As plaintiff did not have sufficient cash for the down payment, Thaden arranged with defendant Donald M. Earll "to secure a loan on the G Street property." Earll advanced the money, allegedly from a "joint account" which he held with his wife, Louise C. Earll, and took back a new first trust on the G Street property for $3,250. After deducting the amount due under the old trust, a $65 commission, and $14.63 for insurance premiums, Earll turned over the proceeds of the loan to the seller of the Military Road property and plaintiff made up the rest of the $1,500 payment. The note on the G Street property was made payable to a clerk in Earll's office, and Earll and his uncle, Albert M. Harding, became trustees of the G Street trust. Plaintiff did not know that Earll had advanced the money, or that the payee of the note was acting as his agent or straw man.

Earll and his uncle, Albert M. Harding, were also trustees of the $4,500 Military Road trust. While the Military Road transaction was still in the course of settlement, the vendor offered to sell the $4,500 note to plaintiff at a discount of $1,000. Plaintiff declined for lack of funds. Earll, unknown to plaintiff, then bought the note at a $1,500 discount, thus becoming trustee and holder of the notes under both deeds of trust.

Plaintiff moved into the Military Road property and began making payments on the $4,500 second trust note. In the latter part of 1931 he became "pinched for money," and wrote to the bank where he had been making payments, asking for an extension of time. The bank did not reply, but Earll got in touch with him,

told him the bank had nothing to do with the note and he could have the extension. In the latter part of 1932 plaintiff again became pinched for money and requested the bank to inform him as to who held the note. The bank stated that it could not divulge the information, so plaintiff wrote to Earll asking for a reduction in the monthly payments. Earll ignored the letter, but when plaintiff wrote again threatening to notify the first trust mortgagee of his financial condition Earll promptly called upon him. Earll refused to grant any reduction in the payments, but urged him to "hold on," assuring him that "his man" had plenty of money and would see him through. Earll at all times refused to tell who held the note.

By February 4, 1933, Picken, after several conversations with Earll in which his financial embarrassment was discussed, concluded that it was "absolutely impossible" to meet the payments, and notified Earll of that decision. Earll warned that a foreclosure and a possible deficiency judgment might follow cessation of payments. Plaintiff then paid the due installment and moved out of the premises pursuant to an understanding between him and Earll that the property would be sold more easily if it were vacant. March 8, 1933, Earll obtained plaintiff's signature on a letter authorizing "his client" to foreclose. Earll told plaintiff that this was "a mere formality," and plaintiff testified he did not know that the letter authorized foreclosure when he signed it.

The foreclosure sale was held March 21, 1933. The property was bought by Edward T. Harding, another uncle of Earll, acting either for Earll or for him and his wife, Louise C. Earll. Harding put up no money, and the purchase price of $2,200 above the $7,500 first trust, conceded to be fair, was credited on the note. Plaintiff knew of the sale but did not attend. May 26, 1933, defendant Louise C. Earll, claiming to be holder of the note, sued in Municipal Court for a deficiency judgment of $983.98 against plaintiff. The appearance of Mrs. Earll's name (though not her relationship to Earll) as plaintiff caused Picken to suspect collusion, but he assumed that it was "strictly legal" as Earll "seemed to know his business." Having no money to defend and believing that he had no legal defense, plaintiff allowed judgment to go by default on June 26, 1933.

Plaintiff had conveyed his G Street property to his daughter by a deed recorded February 9, 1933, and later notified Earll of that fact. Mrs. Earll promptly brought a creditor's bill in District Court to set aside the conveyance as fraudulent. Plaintiff, wishing to keep the names of his wife and daughter out of the case, offered to settle by having the G Street property deeded to Mrs. Earll in satisfaction of the deficiency judgment. The offer was accepted, the conveyance was made in July, 1933, and the judgment was marked satisfied.

Mrs. Earll collected $765 rent on the G Street property, then sold it for $4,750, less $250 commission. The Military Road property lay idle for 19 months while Earll sought to sell it. It was then sold to one Russon, who defaulted on his payments after paying about $2,000 of the purchase price. Russon's interest thereafter was foreclosed, Edward T. Harding taking title for the Earlls. Since February, 1937, it has been rented at $90 a month.

According to the trial court's findings of fact, "The upshot of these transactions was that the Pickens lost the Military Road property and the G Street property. No accounting was ever made to them. Louise C. Earll, wife of the trustee in the new first trust on the G Street property and in the second trust on the Military Road property, obtained both houses, holding them through Edward T. Harding, the brother of one of the trustees and the uncle of the other."

Plaintiff filed this action May 28, 1936, praying reconveyance of the Military Road and G Street properties, an accounting of the rents received from both properties, damages, an order restraining enforcement of the deficiency judgment, and general relief. The trial court made its findings of fact and conclusions of law, and entered its decree on August 31, 1938. In addition to the facts previously stated, the court found that "defendant Donald M. Earll dominated this transaction throughout. He himself made the loan on the G Street property and it was his money, not that of his wife, which was used to purchase the second trust note on the Military Road property, which note was taken in his wife's name. The 'joint account' and the taking of the second trust note in his wife's name were subterfuges whereby Earll endeavored to occupy the conflicting positions of creditor and fiduciary and betray his trust." The court found further that the money for this loan did not come from the "joint account"; that plaintiff assumed, when served in the Municipal Court suit, that Louise C. Earll, plaintiff there, was the wife or mother of the defendant Donald M. Earll, but "suspected nothing wrong, as Earll seemed to know his business" and plaintiff "had no business experience or knowledge of law, and no money." For these reasons the Pickens made no defense and allowed judgment to go by default against them. The findings further state that Picken's proposal for settlement of the judgment was "made in ignorance of the law governing such cases." As conclusions of law the court found the defendants guilty of fraud in secretly purchasing the $4,500 note at a discount, in concealing and refusing to disclose Earll's interest, and in procuring the Municipal Court judgment and the deed given in satisfaction of it. The defenses of laches, unclean hands and res judicata were found not sustained, as was that of "ratification" by the plaintiffs, because they "were cestuis que trustent and did not know all the material particulars and circumstances and were not apprised of the law and how the facts, if they had known them, would be dealt with by a court of equity." Defendants were ordered to cancel the note on the G Street property, and to pay $3,100 damages with interest from the date of the decree.[2] Reconveyance of the properties was denied for the reasons that the G Street property had been resold to a bona fide purchaser and that plaintiff was unable financially to "carry" the Military Road property if it were returned to him. Both parties appeal, defendants contending that plaintiff is barred by ratification, laches and res judicata; and plaintiff seeking a complete accounting of all rents and profits on both properties with interest to the time of judgment.

The principal issues raised on the appeal are: (1) whether Earll, being trustee, properly could purchase the note se-

[2] The items constituting the aggregate sum of $3,100 allowed as damages are set forth below in the portion of the opinion which deals with that phase of the case.

cured on the trust property; (2) whether, having done so, he could foreclose; (3) whether he could purchase the trust property for himself at the foreclosure sale; (4) whether plaintiff "ratified" the actions of the trustee relative to the foreclosure and the deficiency judgment; (5) whether plaintiff is guilty of laches; (6) whether the Municipal Court deficiency judgment is res judicata as to the matters here in issue; (7) whether plaintiff may recover the foreclosed property or obtain an accounting of profits without tendering the amount due defendant; (8) whether the trial court's award of damages was proper.

We think the trial court's determination of the substantive issues was right. However, certain modifications will be required in the relief which was awarded.

■ I. The issue which underlies all others in the case relates to the propriety of Earll's purchase of the $4,500 second trust note and the consequences which flow from that transaction. Defendants argue strenuously that there "was no impropriety or fraud in the purchase by Earll or his wife of a note secured by a deed of trust under which Earll was already trustee." The cases cited to sustain this claim[3] hold merely that a trustee may take title lawfully to instruments secured on the trust property.[4] They do not decide for whom the trustee takes title or whether he may so deal with the security interest as to make a profit for which he is not accountable to the cestuis. Clearly he may not make such a profit, whether in the purchase or in the sale of, or other dealing with, that interest. The following statement summarizes the long-established and widely, if not universally, prevailing law on the subject and is fully

sustained by the authorities: If he [the trustee] purchases an encumbrance upon trust property and pays less than the face amount of the encumbrance, he is not permitted to recover from the trust estate more than the amount which he paid for the encumbrance with interest thereon. * * * It is * * * against public policy to permit the trustee to make a profit for himself from a transaction so closely connected with the administration of the trust. It is not improper for him to purchase the encumbrance, and he is entitled to recover from the estate the amount which he paid with interest. But it is improper for him to make a profit thereby. If instead of continuing to hold the encumbrance he resells it at a profit, he is accountable to the beneficiaries of the trust for the profit.[5]

■ The foundation of the rule is the trustee's obligation of undivided loyalty to the trust. He cannot deal with it at arm's length or in the mores of the market place. Acquisition of an adverse interest interjects self-interest into a relation with which it is wholly incompatible and dilutes the allegiance of confidence with self-preservation. That others may purchase the security and take full advantage of their bargain, that the cestui has not the means to do so, or that the trustee might do so if he were not trustee, does not destroy the obligation or permit him to subject it to "the 'disintegrating erosion' of particular exceptions."[6] By accepting the trust he disqualifies himself to accept such a bargain and the disqualification continues while the trust remains. Under the rule the purchase is not a nullity, nor does the trustee forfeit to the estate the funds with which it is made. Validating the transaction to this extent, of course,

---

[3] Brewer v. Slater, 1901, 18 App.D.C. 48; Finefrock v. Kenova Mine Car Co., 4 Cir., 1927, 22 F.2d 627.

[4] Cf. notes 5 and 9 infra, and text.

[5] 2 Scott, Trusts (1939) § 170.21. See the following supporting authorities: Jungbluth v. American Bank & Trust Co., 1931, 101 Fla. 289, 134 So. 618; Crawford v. Crawford, 1937, 129 Fla. 726, 176 So. 838; Nampa Investment Corp. v. Demming Exploration Co., 1930, 50 Idaho 46, 293 P. 326; Taylor v. Calvert, 1894, 138 Ind. 67, 37 N.E. 531; Attorney General v. Armstrong, 1918, 231 Mass. 196, 120 N.E. 678; Union Trust Co. v. Johns, Sup.Ct.1919, 107 Misc.

12, 176 N.Y.S. 525; White Earth Creamery Co. v. Edwardson, 1922, 49 N.D. 394, 191 N.W. 622; In re Cake's Estate, 1893, 157 Pa. 457, 27 A. 773; In re Strickler's Estate, 1937, 328 Pa. 145, 195 A. 134.

[6] Meinhard v. Salmon, 1928, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1. "The rule stands 'upon one great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity.'" Crawford County Bank v. Bolton, 1908, 87 Ark. 142, 112 S.W. 398, 400.

156

does create an interest of the trustee adverse to that of the cestui. But that is permitted as much for protection of the estate [7] as from consideration of the hardship otherwise thrown upon the trustee. And the interest of the cestui is safeguarded by surrounding that acquired by the trustee with limitations which go far toward discouraging the acquisition and, when it has taken place, preventing its use in a manner inconsistent with the paramount duty. Accordingly, the law assumes that the trustee buys the encumbrance for the benefit of the trust, not for himself.[8] He therefore is regarded as trustee of the instrument as well as of the property on which it is secured. His purchase is regarded as an advancement for the benefit of the trust. In accordance with this view of the transaction, he does not step into the shoes of the assignor, but his rights are limited to make them consistent, as far as possible, with the dominant confidential obligation. By advancing the money, he obtains a lien against the trust property.[9] But he may not foreclose the original encumbrance against the trust res, Union Trust Co. v. Johns, Sup.Ct.1919, 107 Misc. 12, 176 N.Y.S. 525 (though he may apply to a court of equity to foreclose his equitable lien), and he may be enjoined from doing so.[10] If the attempted foreclosure is completed, it is "void," and the trustee will continue to hold the property for the cestui. White Earth Creamery Co. v. Edwardson, 1922, 49 N.D. 394, 191 N.W. 622. A trustee who buys a claim against the trust at a discount and enforces it in full is guilty of a breach of trust and may be removed, though he has returned to the trust the entire profit made in the transaction. Attorney General v. Armstrong, 1918, 231 Mass. 196, 120 N.E. 678. And the profits from such a transaction belong to the trust.[11] In short, the trustee is permitted to do no act inconsistent with the trust relation, and whatever rights he may acquire by the purchase or other dealing are subordinate to it and must be exercised consistently with it.[12] It is no more consistent with the trustee's duty for him to make a profit by purchasing an encumbrance of the estate at a discount and collecting the full amount from the estate than it is for him to realize the profit by reselling the encumbrance to a stranger. As has been said, it is beside the point that others could do so in either fashion or that the cestui could not do so for whatever reason. The rule may be a vestigial reflection of an ancient morality. But whether so or not, the old line should be held fast which marks off the obligation of confidence and conscience from the temptation induced by self-interest. He who would deal at arm's length must stand at arm's length. And he must do so openly as an adversary, not disguised as confidant and protector. He cannot commingle his trusteeship with merchandizing on his own account. No device of concealment, whether in the use of straw men or otherwise, can legitimate such a miscegenation.

 Applying these principles to the present case, Earll must be held to have bought the $4,500 note on behalf of the trust. Consequently, the discount enured to its benefit. It follows also that the attempted "foreclosure" was invalid as to the cestui. By purchasing the note the trustee united both the superior and the inferior titles in himself as trustee. The effect of the transaction was to wipe out the mortgage and leave the property unencumbered except for the prior trust deed and Earll's claim for the advances which he made on behalf of the trust. That claim, as has been said, constituted a lien

---

[7] Occasionally the trustee is the only one willing to advance funds for the benefit of the estate.

[8] Jungbluth v. American Bank & Trust Co., 1931, 101 Fla. 289, 134 So. 618; cf. Taylor v. Calvert, 1894, 138 Ind. 67, 37 N.E. 531.

[9] 2 Scott, Trusts (1939) §§ 170.20, 170.21, 244.1.

[10] Spruill v. Ballard, 1932, 61 App.D.C. 112, 58 F.2d 517; Ballard v. Spruill, 1934, 64 App.D.C. 60, 74 F.2d 464; Nampa Investment Corp. v. Demming Exploration Co., 1930, 50 Idaho 46, 293 P. 326; In re Strickler's Estate, 1937, 328 Pa. 145, 195 A. 134. Cf. Kent v. Livingstone, 1936, 65 App.D.C. 291, 83 F.2d 316.

[11] Attorney General v. Armstrong, 1918, 231 Mass. 196, 120 N.E. 678; In re Cake's Estate, 1893, 157 Pa. 457, 27 A. 773; cf. Taylor v. Calvert, 1894, 138 Ind. 67, 37 N.E. 531.

[12] Other illustrations might be given, e. g., where the trustee obtains an undivided share of the trust estate, he is not allowed to force a partition. Crawford v. Crawford, 1937, 129 Fla. 746, 176 So. 838.

against the trust property. But that lien was a general equitable one, subordinate to the trust relationship, not a taking over of the rights of the vendor of the note and therefore paramount to it. Those rights were extinguished when the purchase united both titles in the trustee as trustee, and clearly the trust could not foreclose against itself. In place of them the trustee acquired for his personal protection an equitable lien enforceable against the trust but only consistently with its continued existence.

The limitation prevents the trustee from accomplishing indirectly what he cannot do directly. Therefore the attempted foreclosure cannot be regarded as a valid enforcement of his lien. We have held that a trustee in such circumstances cannot enforce his lien "without first applying to a court for its aid." Spruill v. Ballard, 1932, 61 App.D.C. 112, 114, 58 F.2d 517, 519. Other authority supports this view.[13] Any other would open the way to evasion or nullification of the rule against the trustee's acquisition and enforcement of interests not only antagonistic to, but destructive of, the trust. That the view we have adopted may involve hardship for the trustee or defeat his anticipations does not overcome the fact that the contrary one might impose greater hardship upon the beneficiary. Nor is the trustee left entirely without remedy. He may have reimbursement from the income of the trust. If that is insufficient, he may apply to the court to obtain satisfaction from the trust res, which may be allowed under appropriate safeguards.[14] But summary foreclosure he cannot give to himself as he might to a stranger. Here foreclosure to satisfy Earll's claim would destroy the trust completely. It did that and more. The attempt was made without consent of the court or of the beneficiaries, ignorant as they were of their rights, and was in breach of trust under the guise of foreclosing a note belonging to another. Earll honestly may have thought that he was acting within the law. But he intended to make a profit at the expense of his beneficiaries. He regarded them as strangers standing at arm's length and on equal footing, not as the objects of his trusteeship. He did not give up that position when he acquired the note, but attempted to maintain and secure all of the advantages of the dual status of creditor and trustee. The result has been to gather into his own hands all of the trust res and other property besides. He cannot retain it, the fruit of his effort to make a profit which he was disqualified to accept.

An added reason for this result is that Earll himself bought in the property at the foreclosure sale.[15] He was both vendor and vendee in that transaction. A trustee is not permitted to buy in the trust property on his own account with-

---

[13] In Nampa Investment Corp. v. Demming Exploration Co., 1930, 50 Idaho 46, 293 P. 326, the trustee obtained bonds secured on the trust property. He was enjoined from foreclosing, for the reason that he held the bonds as trustee; and the court also held that he could not be reimbursed for his advances in the attempted foreclosure proceeding. Cf. White Earth Creamery Co. v. Edwardson, 1922, 49 N.D. 394, 191 N.W. 622; In re Strickler's Estate, 1937, 328 Pa. 145, 195 A. 134. See also Crawford v. Crawford, 1937, 129 Fla. 746, 176 So. 838.

[14] The remedy is allowed with caution. Normally reimbursement in regular course out of income is contemplated. But circumstances creating unforeseen delays or apparent impossibility of securing payment from income may warrant the court's giving permission to secure satisfaction from the trust res. Cf. In re Strickler's Estate, 1937, 328 Pa. 145, 195 A. 134. Ordinarily this is limited to selling only so much of it as is necessary to satisfy the claim. Cf. Tennant v. Trenchard, L.R. 4 Ch.App. 537 (1869). If allowance of such satisfaction will destroy or seriously impair the purpose of the trust, the courts are reluctant to grant it. 2 Scott, Trusts (1939) § 244.1.

[15] Defendants claim that it was purchased on behalf of Mrs. Earll, but the trial court found that "Donald M. Earll dominated this transaction throughout * * * it was his money, not that of his wife, which was used to purchase the second trust note on the Military Road property." But the purchase, whether by Earll or his wife, was a breach of trust. Holman v. Ryon, 1932, 61 App.D.C. 10, 56 F.2d 307; In re Cake's Estate, 1893, 157 Pa. 457, 27 A. 773; cf. Ballard v. Spruill, 1934, 64 App.D.C. 60, 74 F.2d 464; Kent v. Livingstone, 1936, 65 App.D.C. 291, 83 F.2d 316. See also Realty Inv. & Sec. Corp. v. H. L. Rust Co., 71 App.D.C. ——, 109 F.2d 456, decided December 4, 1939.

out permission of the court or informed consent of the beneficiaries.[16] Earll had neither. Defendants concede that this is the law, but assert that failure to obtain consent or permission before the sale merely makes the purchase voidable, not void, and therefore subject to ratification or confirmation later by the cestuis. They claim, further, that there was such confirmation here.

II. Assuming without deciding that the trustee's purchase of the trust property at his own sale and as part of his unauthorized attempt to enforce his personal lien is merely voidable,[17] there was no "ratification" in this case. It is true that the Pickens did not attempt to prevent the foreclosure sale, that they later suffered the deficiency judgment in the Municipal Court to go against them by default and that still later they conveyed the G Street property to Mrs. Earll in satisfaction of that judgment. It is true also that plaintiff acquired knowledge that Mrs. Earll was the holder of the $4,500 note, or claimed to be so, when the Municipal Court suit was instituted, and thereupon suspected that she bore some relation to Earll, whether that of wife or mother. But the mere existence of such suspicions was not sufficient to constitute a confirmation. Under the rule of Thompson v. Park Savings Bank, 1938, 68 App.D.C. 272, 96 F. 2d 544, for a cestui que trust to "ratify" or confirm a breach of trust, he must be apprised of all the material facts and as well of their legal effect. No half-hearted disclosure or partial discovery is sufficient in either respect. The trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful inferences, conclusions and suspicions from his efforts to extract for his own benefit not only the trust res but other property of the beneficiary as well. Plaintiff's suspicions did not constitute the full knowledge of all the material facts upon which confirmation may be predicated. Furthermore, he obviously had no conception of the legal significance of those facts. This is self-evident from his sufferance of the deficiency judgment by default and con-

veyance of his remaining property to satisfy it. These acts go only to show that his guard was down and to demonstrate his ignorance, not to indicate that he acted with the informed and advised judgment upon which alone a confirmation may be based. There was therefore no confirmation of the sale or of prior transactions by the sufferance and satisfaction of the deficiency judgment.

III. Nor is that judgment res judicata of the issues involved here. Defendants contend that it is so, since, they assert, all of the reasons which plaintiff now gives for setting aside the foreclosure would have been defenses in that action if plaintiff had advanced them. Therefore, it is said, this is an improper collateral attack. The argument is founded upon the view that the fraud by which the judgment was secured was "intrinsic" within the distinction drawn in United States v. Throckmorton, 1878, 98 U.S. 61, 25 L.Ed. 93.[18] Possibly the present case may be regarded as presenting two species of fraud. The fraudulent foreclosure could have been proved as a defense in the Municipal Court action, and therefore might be regarded as "intrinsic." But the trustee's failure to reveal that he had been acting in his own interest and to disclose not only this fact but its legal significance to the cestuis prevented that defense from being made. That was fraud of the "extrinsic" type. But we need not rest the decision upon so tenuous a distinction. It would be strange law which would forbid the defendants to take advantage of plaintiff's ignorance of fact and law by enforcing their own claim against the trust property and buying it for themselves, yet would allow them to take advantage of that ignorance to secure an invulnerable deficiency judgment. The crux of the matter is that defendant's violation of the duty of disclosure continued until after the judgment was obtained and satisfied. Its effects were not overcome, as has been said, by plaintiff's mere suspicions. In such circumstances it is immaterial whether the fraud be regarded as extrinsic or as an exception

---

[16] Doerschuck v. Mellon, 1931, 60 App. D.C. 383, 55 F.2d 741; Holman v. Ryon, 1932, 61 App.D.C. 10, 56 F.2d 307; 2 Scott, Trusts (1939) §§ 170.1–170.11.

[17] But cf. White Earth Creamery Co.

v. Edwardson, 1922, 49 N.D. 394, 191 N. W. 622, and text supra note 11.

[18] Cf. Continental National Bank v. Holland Banking Co , 8 Cir., 1933, 66 F. 2d 823.

to the intrinsic fraud rule.[19] Earll's obligation to disclose his breach of trust ran not only to the plaintiff here but also to the court in the suit for the deficiency judgment. His failure to discharge it renders that judgment subject to attack in equity. Similarly it vitiates the satisfaction of the judgment as a settlement. Ferguson v. Wachs, 7 Cir., 1938, 96 F.2d 910.

IV. Several other defenses may be disposed of briefly. That of laches is predicated upon inexcusable delay which prejudices the defendant. There is no showing of prejudice here. Nor does it appear that plaintiff delayed in bringing this suit for ulterior reasons or, in fact, that he delayed at all after learning all the facts and their legal significance. Furthermore, neither this defense nor that of "unclean hands" comes with propriety or persuasiveness from one in the defendant's position. The "unclean hands" argument is based on plaintiff's transfer of the G Street property to his daughter before the foreclosure of the Military Road trust. If it had been intended to hinder, delay or defeat the defendant in an effort to reach it under the deficiency judgment, the defendant is in no position to question the transfer in view of the methods by which the judgment was obtained. But the trial judge found that the transfer was not made with fraudulent intent and there is no reason to disturb his finding.

Defendants also say that plaintiff must tender what was due on the notes held by them before he can recover either the property or money damages. The argument assumes that plaintiff stands in the position of a mortgagor who seeks to set aside a foreclosure sale. However, as has been shown, the premise is false. The mortgage lien was converted into a general equitable one, subject to the limitations concerning enforcement which have been stated previously, when the trustee purchased the note. A trustee holding such a lien may not unlawfully seize the trust property, then demand payment of his personal claims against the trust as a condition of returning it. Otherwise the rule requiring leave of court for securing satisfaction of his claim would be set at naught. His duty as trustee requires him to return the property unlawfully seized and, if he so desires, seek the court's permission to have his lien satisfied from it.

The question remains whether it was possible for the court below to authorize such satisfaction in this case nunc pro tunc and, if so, whether this was done. It may be that such action would be justified in some circumstances, though the enforcement thus confirmed was originally a breach of trust. But we do not think this is true in the circumstances presented here. Although plaintiff's default may have been caused in part by the reduction in his income, his financial difficulties were attributable equally to the pressure placed upon him to pay interest and principal on the second trust note which was bought by Earll. Had he not been pressed for payment upon it, he might have been able to carry the Military Road property, at any rate until he could find a purchaser for the property. The foreclosure prevented this. In these circumstances he should not have been pressed for immediate payment of the note or of the trustee's advances. Even if the trustee had applied to court for permission to enforce his lien, further time would have been available for finding a buyer. Consequently, to confirm now the pressure brought by Earll to secure the payment would be to hold as a matter of law that the plaintiff could not have worked himself out of his financial difficulties and saved all or part of his equity in the property, if that pressure had not been applied, and also to assume that permission to enforce Earll's lien would have been given unconditionally and immediately.

Furthermore, it does not appear that the court intended to or did confirm the foreclosure as an enforcement of the trustee's lien. The court found that "the plaintiffs are not *now* financially able to carry the Military Road property if it should be reconveyed to them." (Italics supplied.)

[19] "The failure to perform the duty to speak or make disclosures which rests upon one because of a trust or confidential relation is obviously a fraud for which equity may afford relief from a judgment thereby obtained, even though the breach of duty occurs during a judicial proceeding and involves false testimony and this is true whether such fraud be regarded as extrinsic or as an exception to the extrinsic fraud rule." 3 Freeman, Judgments (5th Ed.1925) § 1235; Ferguson v. Wachs, 7 Cir., 1938, 96 F.2d 910; Note, 1920, 5 A.L.R. 672.

To use plaintiff's present financial condition, induced largely by defendant's breach of trust, as a basis for confirming that breach, including the foreclosure, would be improper. Plaintiff's right to a reconveyance depends on whether Earll's enforcement of his lien was proper when it was done. If not, plaintiff is entitled to have the property returned and to an accounting, irrespective of the possibility that he may lose it again by a proper foreclosure in the future. There is no valid reason for refusing to return the Military Road property to plaintiff.

V. In this view of the case, the relief granted below will require modification. The trial judge apparently assumed that the foreclosure of the Military Road property was proper under the circumstances, although defendants could not be allowed to make a profit on the transaction. He therefore allowed $1,085 damages on that transaction figured as follows: Defendants should have credited toward payment of the note the $1,500 discount and the $568.98 interest which they received under that note; thus at the time of foreclosure only $1,115 remained owing on the note, and therefore plaintiff was entitled to the balance of $1,085 from the sale price of $2,200. The court thought the transfer of the G Street property could have been set aside except for the fact that it has been resold to a bona fide purchaser. It therefore allowed as damages the $1,250 profit which defendants obtained on the resale, and also $765 rent which defendants received on the property prior to sale.

We think this finding of damages is erroneous. Plaintiff was beneficial owner of the Military Road property throughout, and Earll must be regarded as having acted as trustee in all his actions relative to that property. Plaintiff is therefore entitled to an accounting of all profits made on the property since the foreclosure sale, as well as of all interest and principal payments to Earll under the note. In making this accounting, the following factors must be considered: Earll is entitled to reimbursement out of the fund for all reasonable and lawful expenses incurred in managing the property; he is also entitled to interest on the unpaid loan to the trust; the trial court may also find that he is entitled to have that loan satisfied or amortized out of the income from the property or, if that is not sufficient, then by appropriate enforcement of the lien against the trust res; otherwise, all other money coming into his hands from the trust property should be paid to plaintiff with interest from the time the trial court shall find it should have been paid.[20] The statute, D.C.Code (1929) tit. 17, § 8, provides that in actions for "breach of contract" interest shall be allowed only from the time of judgment, but that interest may be included in the damages "if necessary to fully compensate the plaintiff." Without deciding whether a breach of trust is a breach of contract within the meaning of the statute, it seems clear that plaintiff here would not be fully compensated without interest on the money which has been wrongfully withheld from him during the past decade. Plaintiff also asks for the reasonable rental value of the property during the nineteen months that it was vacant while defendants were trying to sell it after the foreclosure. There is no finding of the trial court, or evidence in the record, to show whether defendants made reasonable efforts to rent the property or could have rented it had they made such efforts. If the lower court should find, in the further proceedings which will be necessary, that defendants should have maintained the productivity of the trust property during this period by renting it and made no reasonable efforts to do so, plaintiff will be entitled to the fair rental value with interest.[21]

The G Street property is in much the same situation, though it cannot be returned because resold to a bona fide purchaser. Since defendants obtained it under the representation that there was a valid deficiency owing on the Military Road property foreclosure, they must be regarded as holding it under a constructive trust.[22] All money coming into their hands from that property must be paid to plaintiff, with interest from the time the court shall find it should have been paid. Defendants may deduct the reasonable expense they have incurred in maintaining the property. Plaintiff normally would be entitled to elect whether to demand the value of the property at the time of the

[20] 1 Sutherland, Damages (4th Ed. 1916) §§ 320, 353; 2 Scott, Trusts (1939) §§ 207, 207.1.

[21] 2 Scott, Trusts (1939) § 181.
[22] 3 Scott, Trusts (1939) § 468.

wrongful sale by his trustee, the actual sale price received by the trustee, the value of the property at the time of suit, or the specific property itself.[23] The latter remedy is foreclosed in this instance. The trial court awarded damages in the amount of the net profit on resale and, as plaintiff does not assign that award as error here, it seems that plaintiff has elected the actual sale price as the measure of damages. However, plaintiff is entitled to interest on this money from the time of the sale.

Plaintiff also asks return of all interest paid to Earll under the G Street trust. This seems to be on the assumption that this interest represents a profit which the trustee cannot make at the expense of the trust. The assumption is inaccurate. By lending the money necessary for the trust, the trustee became a creditor, though with attenuated enforcement rights, and was entitled to the return of his loan with interest.[24] But he is not permitted to fix his own rate of interest.[25] He may not profit at the expense of the trust, and therefore he is entitled to receive only such interest as the trial court may consider proper. The rest of the interest paid, if any, plaintiff is entitled to recover with interest.

Plaintiff asks return of the $65 commission which Earll received at the time of making the G Street loan and also the $14.63 insurance premium which he collected at that time. While it appears from the record that Earll "wrote" the insurance on which the premium was collected, it does not appear how much, if any, of this premium was profit to Earll. Where the trust has received the benefit from a transaction with the trustee, it can recover only the profit which the trustee derived from dealing with it.

The claim for repayment of the $65 commission is on sounder footing. Earll was requested by Thaden to "secure a loan" on the G Street property. Thaden testified that "Mr. Earll was simply a broker in the transaction." It is elementary that a broker may not act for both parties in a transaction; and that if

he does so act, he may be required to return any commissions which he has received for his services.[26] Here Earll was acting both for himself and for plaintiff, and he must therefore restore the commission with interest.[27] In this view of the case it is not necessary to consider whether Earll knew at the time of the loan that he was to be trustee, and for that reason could not charge a commission.[28] It appears that plaintiff paid interest on the face value of the note, despite the fact that this commission was deducted from the amount of the loan. In calculating the interest due Earll, this $65 commission must be deducted from the nominal sum of the loan, since plaintiff got no benefit from it. The same will be true of any profit which Earll may have made from the insurance premium.

In disposing of the case as we have done, we recognize that the defendant may have been free, subjectively, from deliberate intention to perpetrate a fraud and that he may have regarded each step in his conduct as entirely within the law. If that was the case, it was due no doubt to the fact that he regarded himself as merely a creditor of the plaintiffs and entitled to all of the advantages of such a position. Though his mind may have been clear of any sense of guilt and one who was merely a creditor could have done all that he attempted to do, his error was in the assumption that he could combine in himself the functions of creditor and trustee for his debtor. His present difficulties and the reparation he must make now all flow from that error and what he did in following it out in conduct. That he may have intended no fraud does not overcome the fact that one has been committed. He intended to do and did what the law does not permit to be done, and that is sufficient to sustain the reparation which it has been necessary to require him to make.

The case is remanded for an accounting in accordance with the principles which have been stated, and for such other necessary proceedings as are not inconsistent with this opinion.

So ordered.

---

23 2 Scott, Trusts (1939) §§ 208.1, 208.-2, 208.3, 208.4.
24 2 Scott, Trusts (1939) § 170.20.
25 Ibid.
26 2 Mechem, Agency (2d ed. 1914) §§ 2374, 2398, 2412, 2467, 2474, 2477.

27 Cf. Bruce v. Bevis, 1910, 56 Wash. 547, 106 P. 129.
28 Cf. Cohen v. Hutchins, 1929, 59 App. D.C. 6, 32 F.2d 397.