Amelia SHERIDAN, Administratrix of the Estate of Leo G. Sheridan, deceased, Appellant,

v.

PERPETUAL BUILDING ASSOCIATION et al., Appellees.

No. 17561.

United States Court of Appeals District of Columbia Circuit.

Argued June 11, 1963.

Decided Aug. 8, 1963.

Mr. Landon Gerald Dowdey, Washington, D. C., with whom Mr. Norman H. Bartow, Washington, D. C., was on the brief, for appellant.

Mr. Thomas S. Jackson, Washington, D. C., with whom Messrs. Robert M. Gray, John L. Laskey and Austin P. Frum, Washington, D. C., were on the brief, for appellees.

Before EDGERTON and PRETTYMAN, Senior Circuit Judges, and WILBUR K. MILLER, Circuit Judge.

WILBUR K. MILLER, Circuit Judge.

In December, 1952, Leo G. Sheridan executed to Samuel Scrivener, Jr., and Junior F. Crowell as trustees a deed of trust on certain realty to secure a note for $13,500 payable to Perpetual Building Association. Because of delinquency in the payment of instalments, the trustees held a foreclosure sale on January 3, 1958, and accepted the high bid of $12,050, which was sufficient to cover the unpaid balance of Sheridan's debt and all expenses. The sale was made subject to a federal tax lien of $4,045.36.[1]

Because the purchasers were negotiating for the release of the tax lien, subject to which they had made their bid, Perpetual granted them an additional period of 30 days within which to settle. It did so without previously consulting the trustees. When the purchasers finally refused to settle because they could not make a satisfactory adjustment of the tax lien, Perpetual and the trustees completely released them from their contract upon forfeiture of the $500 deposit they had made. Thus the trustees relinquished the right to sue the purchasers for specific performance or to resell at their risk and sue them for any deficiency which resulted. So, the first sale was not consummated.

Some months later Perpetual seized the balance of fire insurance proceeds [2]—the

1. In order to protect its interest, Perpetual bid $12,000 for the property burdened by the tax lien.

2. The house was damaged by fire in 1955. The insurance received was held in a joint account in the names of Sheridan and Perpetual. The vacant house had not been fully repaired and was deteriorating rapidly because of vandalism when Perpetual seized the joint account.

sum of $4,427.26—and applied it on Sheridan's note and, at about the same time, directed the trustees to conduct another foreclosure sale. At the second sale, held on July 9, 1958, the property brought only $9,550, which was paid by the purchaser and partially distributed by the trustees. This was $2,500 less than the accepted bid at the first sale, but it was enough to cover Sheridan's note as reduced by the seizure of the insurance fund, as well as the expense of sale, and to leave a balance of $1,242.77 in the hands of the trustees.

Sheridan sued Perpetual and the trustees for an accounting and for damages in the amount shown thereby. At pretrial, he amplified the relief sought and claimed, among other things, $4,427.26—the balance of the insurance fund alleged to have been wrongfully appropriated by Perpetual—or "damages against the [defendant] trustees for breach of trust in the same amount." Perpetual's pleading pointed out that, if it were required to restore the insurance account which it had credited to Sheridan's note, the result would be that the proceeds of the second sale would not cover Sheridan's debt to it; Perpetual counterclaimed against Sheridan for that deficiency, should it arise. The case having been submitted on a record made up only of documentary evidence, the District Court's judgment directed the trustees to pay to Sheridan the sum of $1,242.77, the part of the proceeds of the second sale remaining after the payment of his debt as reduced by the insurance fund seized, and after payment of costs of sale. In all other respects, Sheridan's complaint was dismissed.

His appeal from the dismissal was first heard by a division of this court; but we considered the case of sufficient public importance to engage the attention of our full bench, and conducted an *en banc* rehearing. Our unanimous opinion[3] reversed the judgment dismissing the complaint, and remanded for further proceedings not inconsistent with the views expressed therein. We stated principles which apply in cases such as this and set forth the apparent infirmities in the appellees' position which prompted us to remand for clarification as to whether a breach of trust had in fact occurred, pointing out that "When it is shown that a fiduciary has conflicting interests, ancient principles require him to bear the burden of proving that he has been faithful to his trust."

We quote from our first opinion to provide the background for discussion of the proceedings after remand and the District Court's action with respect thereto:

"This case raises, as many cases have before it, the problem of the duties and obligations of trustees under deeds of trust to secure loans. We have on several occasions pointed out that trustees under such deeds of trust should act for the benefit of both parties, borrower as well as lender. Trustees should be impartial and above suspicion. The practice (quite prevalent in the District of Columbia) of having directors, officers or employees of building and loan associations and other lending institutions act as trustees in foreclosure proceedings is subject to suspicion and criticism, as various cases, including this one, demonstrate.

"In this case, the trustees were closely connected with Perpetual Building Association. The trial court found that one trustee (appellee Samuel Scrivener) is an officer and director of Perpetual, and that the other (appellee Crowell) manages 'Fidelity Investment Company, a partnership, the members of which are members of the Board of Directors of Perpetual.' These relationships made it 'the duty of the court to scrutinize very closely all that * * * [they] did in the execution of the trust * * *.' Clark v.

3. Sheridan v. Perpetual Building Assoc. et al., 112 U.S.App.D.C. 82, 299 F.2d 463 (1962).

Freedman's Savings & Trust Company, 100 U.S. 149, at page 152, 25 L.Ed. 573 (1879)."

Our opinion pointed out that the decision to release the purchasers at the first sale, which resulted disastrously for Sheridan, "appears prima facie to have been a decision by and in the interest solely of the lender," and said there was nothing to indicate whether the trustees had considered the use of one of the other alternative remedies against a defaulting purchaser provided by the terms of the sale: to sue him for specific performance, or to resell at his risk and sue him for the difference if the property brought less money at the second sale. Consequently, we said, "Whether the trustees formed any reasoned conclusions as trustees concerning their obligations to Sheridan remains, on this record, an unanswered question." So we remanded for the trustees to bear the burden of proving they had been faithful to their trust, with the admonition to the District Court to scrutinize their conduct with the care required by the Clark case.

██ Because of their close connection with Perpetual, Scrivener and Crowell were not qualified to act as trustees unless Sheridan, after full and fair disclosure to him of the facts concerning it, had acquiesced. General Auto Truck Co. v. Rust, 66 App.D.C. 392, 88 F.2d 774 (1936); Realty Investment Corp. v. Rust, 71 App.D.C. 213, 109 F.2d 456 (1939). They had no right to keep silent and suppose that somehow Sheridan would learn of their intimate association with Perpetual from outside sources. Half-hearted disclosure to Sheridan or partial discovery by him would not have been enough to discharge the trustees' duty to inform him of the connections which, if unrevealed, disabled them. Earll v. Picken, 72 App.D.C. 91, 99, 113 F.2d 150, 158 (1940).

The record shows no affirmative disclosure by Perpetual or the trustees. As to Scrivener, the only showing was that he was listed as an officer and director in Perpetual's published statements of its condition, and was known as such in business circles. Crowell, the other trustee, testified he had never told Sheridan that Fidelity Investment Company, managed by him, was owned and operated for their individual profit by partners who were the directors of Perpetual. He had never revealed that fact publicly except "Perhaps on one occasion when I was under oath as a witness."

 With respect to this, the trial judge made the following finding of fact:

"* * * Neither the trustees nor Perpetual formally advised the plaintiff of the connection between the trustees and Perpetual. However, the plaintiff did not testify in this case, and the Court does not know whether plaintiff in fact knew of the connection or not, there being evidence that Scrivener's position on the Board of Directors of Perpetual is regularly published by Perpetual and is well known in the business community."

But Sheridan is not to be charged with knowledge of the trustees' connections with Perpetual, which were disqualifying if undisclosed, merely because he did not take the stand and deny such knowledge. The trustees had the burden of showing he was fully informed. They did not do so, nor did they call him as a witness although he was under their subpoena.

Perhaps their failure to disclose would have been excusable had they demonstrated that all their acts as trustees had been scrupulously fair and impartial, after due consideration of the interests of both parties. They did not make any such demonstration. In presuming to act as trustees without disclosing to Sheridan their close association with Perpetual, Scrivener and Crowell violated, in the very beginning, their fiduciary duty to the borrower. Their failure to disclose was a continuous violation, for if at any time Sheridan had been told of their disability he could have demanded their removal and, we think, would have been entitled to that relief.

Moreover, had the trustees made full and frank disclosure of their conflicting

interests, they would still have owed to both parties for whom they acted the fiduciary duty of equal consideration. We turn now to consider whether the trustees showed at the second trial that they had been faithful to their trust insofar as Sheridan was concerned.

The trustees' testimony at the second trial—particularly that of Scrivener—revealed not only callous indifference to Sheridan's rights, but also continual consultation with, if not dominance by, Perpetual; indeed, Scrivener indicated his identity of interest with Perpetual, of which he was an officer and director, when he said, "Mr. Sheridan [and a corporate successor in title] had *our money* * *." (Emphasis supplied.) Testifying on October 5, 1962, Scrivener said, "I never saw the gentleman [Sheridan] until yesterday morning." Again he said, "Mr. Sheridan was sort of out of it" and "No, I never had any discussion with him, no." [4]

Scrivener testified that he thought the trustees' duty to Sheridan was merely to see "that we got the highest price." He said, "He [Sheridan] had no obligation whatsoever. *If we got a sufficiently* high price—" (Emphasis supplied.) Here the trial judge interrupted the witness:

"THE COURT: Did you have any greater obligation to the Perpetual? They were likewise interested simply in the highest price, at least up to the value of this property, were they not, for their Deed of Trust note?

"THE WITNESS: Yes, I think that's right.

4. At this point the trial judge had the following colloquy with the witness:
"THE COURT: Mr. Scrivener, something puzzles me. You say between the first and second sale that the plaintiff in this case was out of it.
"THE WITNESS: In 1955 Mr. Sheridan sold the property to Shirley Schnitzer, who is the wife of Hollander, and Mr. Hollander, who went to—
"THE COURT: I appreciate that, but the man is still the maker of a $12,000 note which you are a Trustee for, to take care of his interest. Now, what do you mean by 'he is out of it'?

"THE COURT: And, yet, you saw fit to consult with them constantly and, yet so far as your testimony goes, you have never yet consulted with this maker of the note, to whom you owed a duty. You have never asked him whether or not you should forfeit the deposit on the first bid, you never asked him if he wanted to advance the funds to sue, or what he would prefer you to do; not that you would be bound by it in the slightest, but you are consulting one cestui and not the other, and that puzzles me.

"THE WITNESS: Well, I believe that at first, and the second sales [sic], number one, Mr. Sheridan was advised that there would be one. Either Mr. Sheridan or his representative was there. I believe that they possibly had some obligation with respect to their own interests.

"THE COURT: Maybe they did, but Perpetual knew the sale was there, too, and Perpetual knew what the situation was and, yet, you saw fit to consult Perpetual about whether you would forfeit the deposit or go ahead and sue, but your other cestui, to whom you owed an equally high duty, it seems to me, you completely ignored.

"THE WITNESS: Well, it seems to me also, Your Honor, that Mr. Sheridan, and subsequently the 1823 Corporation, *had our money,* the Association's money. [Emphasis added.]

"THE WITNESS: Well, I mean this: That we were attempting to get the highest price but I don't—he received the notices and I think that that was all that there was—I mean, all we did. I don't honestly know, Your Honor, what else we could have possibly done with him.
"THE COURT: Not what you could have done, but your statement astounds me, particularly in view of this case. It could be given the implication that you weren't in the slightest concerned with Mr. Sheridan or his interest."

"THE COURT: It didn't have a cent of your money as a Trustee, not one single, solitary penny.

"THE WITNESS: That is agreed, understood, Your Honor."

In speaking of the decision to release the first purchasers from any liability under their contract beyond forfeiture of the deposit without giving Sheridan the opportunity of suggesting a different course which might have saved him from the loss he suffered, Scrivener insisted the trustees had acted correctly in ignoring Sheridan. Untaught by our first opinion as to the duties of a fiduciary, he said, " * * * I think we [Perpetual's treasurer and the trustees] did the right thing and *I'd do it tomorrow."* (Emphasis supplied.)

Our quotations from Scrivener's testimony illustrate its general tenor, which unquestionably was that he felt the trustees were under no duty to regard the interests of Sheridan, and owed loyalty only to Perpetual. Small wonder that the trial judge strongly urged counsel for appellees to negotiate a settlement because of Scrivener's testimony. He said Scrivener "has said things that could be picked up to just blast this whole system * * *." Crowell was not as openly disdainful of Sheridan but contributed nothing to show he and Scrivener had given regard to Sheridan's interests when they released the first purchasers without consulting him, and so caused him to suffer substantial loss.

The trial judge found that "the Trustees had no reason to believe that the property would bring less at a second sale than at the first," thus implicitly saying they had reason to believe it would bring at least as much. There is nothing in the record to support this finding except the statements of the trustees to that effect which were merely their conclusions. We think the record shows there was reason to believe the property would bring less at a second sale because, as the trial judge found, it "had suffered further damage from vandals" during the months which followed the first sale. Further, the seizure of the insurance fund just prior to the second sale indicates that Perpetual and Scrivener anticipated that a deficiency might result therefrom. Presumably, the insurance money was seized in reliance on the following provision of the deed of trust:

> " * * * That the improvements forming part of said realty shall be insured to the satisfaction of the Treasurer [of Perpetual], who shall have the right to designate the insurer and to apply the proceeds of such insurance, including any premium rebate, to any deficiency in repayment to the Treasurer of any loan, additional amount or advance secured by this Deed of Trust." [5].

But a deficiency had not then been ascertained, as the property had not been resold. It follows, therefore, that Perpetual seized the insurance money because it anticipated that a deficiency might result from the second sale.

Moreover, the application of the seized insurance fund to Sheridan's note made it unnecessary for Perpetual, in order to protect its interests, to bid $12,000 plus potential liability for the tax lien, as it had done at the first sale; actually at the second sale, Perpetual bid only $9,500 in addition to its assumption of liability on account of the tax lien.

Scrivener as trustee could hardly have been unaware of the reason for Perpetual's seizure of the insurance fund, as he was, according to his own testimony, not only general counsel of Perpetual but also vice chairman of the executive committee. And it was the executive committee, according to the testimony of Perpetual's treasurer, Thomas, which decided on June 19, 1958, about three weeks before the second sale, "to wipe out the

---

5. The expression "deficiency in repayment * * * of any loan" means, we think, a deficiency which results when the sale of the pledged property does not produce enough to pay the debt secured by the deed of trust. The word "deficiency" is not ordinarily used to mean delinquency in the repayment of instalments.

insurance fund," thus reducing the balance of Sheridan's loan by the amount of the seized insurance. Thomas was asked, "And at that time the Executive Committee included Mr. Scrivener, did it not, Mr. Scrivener, Jr.?" to which he answered, "I would assume he would have been present."

Even if, as the trial judge found, there was no reason to suppose the property would bring less at the second sale than at the first, that fact did not justify the trustees in gambling with Sheridan's interest by releasing the first purchasers. Events showed the gamble was disastrous for Sheridan, as we have said.

■ With respect to the trustees' decision not to pursue the purchasers at the first sale, the District Court found:

" * * * The defaulting purchaser was in the Army and lived in Pennsylvania where he was stationed at some secret installation. The trustees concluded that to proceed under courses (1) or (2) [to sue for specific performance, or to resell at his risk] would have entailed bringing an action against the defaulting purchaser in Pennsylvania, with possible difficulties of obtaining service on the defaulting purchaser, and with the outlay of substantial court costs and attorneys' fees. In view of these circumstances, the trustees, *together with Mr. Thomas of Perpetual,* decided that it would be to the best interest of all parties concerned to adopt course number three and forfeit the deposit. * * *" (Emphasis supplied.)

Apparently conceiving that the facts so found justified the trustees in releasing the first purchasers without consulting Sheridan, the District Court reached the following conclusions of law:

"1. The Trustees formed a reasoned conclusion in electing to forfeit DuMond's $500 deposit as liquidated damages and to resell the property after endeavoring to get the Federal tax lien released; and under all the conditions then existing they acted as ordinarily prudent trustees would have acted in the circumstances then existing and trustees who were cognizant of their duties to all the persons to whom they owed a fiduciary relationship in this matter.

\*　\*　\*　\*　\*　\*

"3. The trustees acted in good faith toward all parties and their actions were in accordance with the requirements of their trust."

We think the record required the contrary conclusion: that the trustees, in disregard of their duty to Sheridan, acted in a manner adverse to his interests, and that therefore they are liable in damages for the loss he suffered when, as a direct consequence of their breach of duty, Perpetual seized the insurance fund.

The fact that Lt. Col. DuMond and his wife, the defaulting purchasers, lived in Pennsylvania where the Colonel was stationed at some secret Army installation, was not enough to justify Perpetual and the trustees in deciding not to hold them to their bargain or, at the very least, to resell the property at their risk. It does not seem to us that the trustees formed a "reasoned conclusion" as to their obligations to Sheridan when they released the purchasers from all further obligation and thereby made possible the loss Sheridan subsequently suffered when the insurance fund was seized. In our opinion, such actions by the trustees were not in accordance with the requirements of their trust.

It does not appear that the trustees investigated the financial responsibility of the defaulting purchasers, nor that they obtained any information concerning the expense of suing them. They did not consult with Sheridan about that, and did not allow him an opportunity to act for his own protection or to underwrite, or contribute to, the expense of litigation with the purchasers. Without additional initial expenses, the trustees could have resold at the risk of the defaulting purchasers—then if, as they claim they anticipated, the property had brought as much as it did at the first sale, there

would have been no occasion to sue the first purchasers and no occasion for Perpetual to seize the insurance fund, and Sheridan would not have been hurt. On the other hand, if the property did not bring as much at the second sale, it would then have been possible to sue the first purchasers for the deficiency. But that possibility was eliminated by the improvident act of Perpetual and the trustees in completely releasing the first purchasers upon their forfeiture of $500.

The trustees have had their chance to show that, despite their conflicting interests, they had been faithful to the fiduciary duty they owed to Sheridan. Not only have they failed to do so; they have recalcitrantly insisted their disregard of Sheridan's interests was proper, and Scrivener has defiantly declared he would follow a like course on occasion. Their liability for the loss suffered by Sheridan is apparent from the record before us. It does not appear that substantially more than the balance of Sheridan's debt, together with all expenses, would have been realized if in dealing with the first purchasers' default the trustees had acted with due regard to their obligation to Sheridan. The loss caused by their disregard of this obligation is therefore the insurance fund which Perpetual seized, together with interest and costs.

The record is not conclusive, however, as to whether Perpetual acted lawfully in appropriating to its own use the jointly held insurance account. The question was not really litigated at the second trial, which was concerned principally with the doings and misdoings of the trustees. One thing is clear from the present record: that the provision of the deed of trust quoted above did not authorize Perpetual to seize the insurance money merely because it anticipated that a deficiency would result from the second sale. But Perpetual's action may perhaps have been justified on some other ground. Whether so or not should be determined at another trial if Sheridan's administratrix [6] desires to press the claim against Perpetual.

Accordingly, the judgment appealed from will be reversed, and the case remanded with directions:

(1) to enter judgment in favor of Sheridan's administratrix against Scrivener and Crowell as trustees and as individuals for $4,427.26 with interest from June 19, 1958, the date of seizure, (credited, however, by the sum of $1,242.77 paid to Sheridan by the trustees pursuant to the District Court's judgment of November 16, 1960)[7] and for the costs incurred by Sheridan in both trials in the District Court, and for the appellant's costs in this court on the present appeal;

(2) to decide (if the administratrix presses the claim against Perpetual), after hearing any proffered additional evidence, whether the seizure of the insurance fund was lawful, and to enter judgment accordingly. That is to say, judgment on this phase should of course go for Perpetual if the seizure was lawful; if not, the same judgment entered against Scrivener and Crowell should be entered against Perpetual also. In no event, however, should there be double recovery.

So ordered.

6. Upon his death, his administratrix was substituted as plaintiff-appellant.

7. The District Court found as a fact that after the first trial the trustees paid $1,242.77 to Sheridan as directed, this sum being the proceeds of the second sale after payment of Perpetual's debt and all expenses of the sale. The trustees withheld this money from Sheridan for about 16 months and did not pay it to him until the District Court ordered them to do so.