Strickler's Estate.

Argued September 27, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*Ella Graubart,* with her *E. Dale Field,* for appellants.

*E. C. Higbee,* of *Higbee, Matthews & Lewellyn,* and *Wm. B. Parshall,* of *Parshall & Parshall,* for appellee.

OPINION BY MR. JUSTICE LINN, November 12, 1937:

These three appeals were argued together. In number 37 appellant complains that the learned court refused to hold the bank liable for breach of trust; in numbers 38 and 39, the complaint is that certain notes were held to be valid claims against the decedent's estate.

On the death of Mary D. Strickler letters testamentary were granted November 5, 1930, to Second National Bank of Uniontown, hereafter referred to as the bank, and to her son and daughter, Edgar E. Strickler and Eugenia S. Miller. Decedent left income producing real estate for which there was no immediate market. Over a year after her death a petition was filed for the sale of the real estate to pay debts, alleged to amount to $46,-287.87. The bank claimed to be a creditor for $39,-

212.50. The sale was made to a corporation, Strickler-Miller Corporation, created by parties interested in the estate, in exchange for its mortgage of February 18, 1932, in the amount of the debts stated in the petition, $46,287.87. No cash was paid.[1]

In December, 1933, the guardian ad litem (appointed after the sale) for minors and unborn children excepted to the First and Final Account of the Executors and challenged the validity of the sale. A petition was also filed for the removal of the bank as executor. We need not recite the objections made because the parties then agreed to settle their differences by a contract which was approved by the court September 29, 1934, and made part of the record. Inter alia, they agreed that, at the audit, the bank and other creditors should prove their claims; that the land conveyed to the corporation should be reconveyed as of September 25, 1934, to the "trustees of the decedent's estate," subject to the mortgage of $46,-287.87, which sum should however be reduced, if, at the audit, creditors were unable to prove their claims. Provision was also made for the disposition of certain exceptions to the account and for the withdrawal of the petition to remove the bank, the bank agreeing to "resign its position as executor and trustee of said estate subject, however, to whatever liability may be imposed upon it by the court as a result of exceptions filed to the account of the executors and to the account of the Strickler-Miller Corporation." An important provision in the agreement was that maturity of the mortgage should "be extended by the executors . . . for a period of three years from the date of the distribution of the assets of the decedent's estate." The bank filed its resignation September 29, 1934, but although it was ac-

---

[1] In appellants' history of the case it is said that "The understanding was that a decree of distribution would then be obtained in which the mortgage would be assigned to the creditors, leaving nothing in the estate for life tenants or remaindermen."

cepted,[2] continued to hold assets of the estate until final distribution. The decree of distribution, made August 15, 1936, contained the following provision: "Fifth. The Second National Bank of Uniontown, having tendered its resignation as an executor, it is hereby discharged from any further liability upon it and its co-executors making distribution in accordance with this decree, and executing a deed to its co-executors for its interest as such executor in the legal title to the real estate of the decedent."

We take up first the breach of trust in record No. 37. A part of the decedent's land, all of which had been conveyed to the executors in exchange for the mortgage of $46,287.87, was subject to a prior mortgage of $25,000 on which there was due a balance of $12,500. The mortgagee was the Girard Trust Company, trustee for Helen J. Hibbs and others. The interest on this mortgage was paid and no demand had been made for the principal. The bank on its own account (before it was discharged, though after its resignation) proposed to the Girard Trust Company, trustee, that it sell to the bank the bond and mortgage which was a lien on part of decedent's real estate. Such a sale was made on August 8, 1935, during the time, it will be observed, when the bank was not only one of the holders of the title to the land but also one of the mortgagees. On August 19, 1935, the bank wrote to the two co-executors, Eugenia S. Miller and Edgar E. Strickler, notifying them that it had purchased the mortgage and that the bank "hereby demands payment of principal and interest of the above stated mortgage on or before October 21st, 1935." The

---

[2] "Now September 29, 1934, at 11: 50 o'clock a. m., the within resignation presented in open court, and after and upon consideration thereof, it is accepted, approved and ordered filed, and it is further ordered that all funds and assets of the estate of the decedent in the hands of said Bank shall be held and retained by it until audit of its account in said estate and decree of distribution thereof."

record shows that the purchase was solicited by the bank and that no effort had been made by the mortgagee to sell the bond and mortgage or to enforce payment. At that time, and until it was discharged by the final decree, the bank was a fiduciary; the resignation did not terminate its duties in that capacity because it was one of the grantees of all decedent's land and still held other assets and was not to be relieved from its fiduciary obligations as to those assets until discharged.

Relying on the rule that such fiduciary relationship disabled the bank from purchasing the encumbrance on decedent's property, as stated, the two co-executors filed a petition in the court below setting forth the facts at length and asking that the bank be restrained "from foreclosing, conveying, transferring, selling or otherwise disposing of the" mortgage pending final action on the petition; and "from collecting, foreclosing, conveying or transferring the said mortgage prior to the date three years after the distribution of the assets of the decedent's estate to and among the parties entitled thereto, or from otherwise using the said mortgage in any manner whatsoever to the detriment of the said estate of Mary D. Strickler, deceased, or to circumvent the terms and conditions of the said stipulation [the contract above referred to]." The court granted such an order until hearing and also granted a rule to show cause. The affidavits and the testimony taken in support of the petition establish the facts stated. Without answering on the merits, the bank filed a motion to discharge the rule and to dissolve the restraining order. On August 15, 1936, the date on which the adjudication of the account was filed, the learned judge also made an order on the petition for the restraining order, discharging the rule to show cause and dissolving the injunction.

We all agree that the action of the court cannot be sustained. Not only was the bank a creditor claiming that the decedent's estate owed it the sum of $39,212.50 (of which at the audit it proved only $35,887.30) but it,

as executor and trustee, was one of the title holders subject to the mortgage of $46,287.87 and had joined in an agreement made for the benefit of the estate and other creditors that the maturity date of that mortgage should be extended three years from the time distribution should be made. Standing in such relationship to the property of the decedent's estate with fiduciary obligations obviously inconsistent with its individual interest, the bank had disabled itself from using its power for its personal benefit at the expense of the estate. It could not therefore, at its own solicitation at private sale, purchase the bond and mortgage for the purpose, as it avowed, of forcing immediate payment or foreclosure. "If the trust estate includes property which is subject to an encumbrance, the trustee violates his duty to the beneficiary if he purchases the encumbrance for himself individually": Restatement, Trusts, section 170, comment j; Perry on Trusts and Trustees, 7th ed., Vol. 1, section 195, page 329; *Mullen, Trustee, v. Doyle,* 147 Pa. 512, 518, 23 A. 807. We are not dealing with a judicial sale or a sale which the fiduciary was powerless to prevent, made at a time when the beneficiary was unable to buy: cf. *Kelley's Estate,* 297 Pa. 17, 146 A. 260; *Reid v. Clendenning,* 193 Pa. 406, 44 A. 500; *Connor v. Gibbons,* 228 Pa. 617, 77 A. 1009; see also *Chiswell v. Campbell, Admr.,* 300 Pa. 68, 150 A. 90; *Herman's Estate,* 90 Pa. Super. Ct. 512; *MacDougall v. Citizens National Bank,* 265 Pa. 170, 108 A. 608; *Tanner's Estate,* 218 Pa. 361, 67 A. 646; *Kenworthy v. Equitable Trust Co.,* 218 Pa. 286, 67 A. 469; *Church v. Winton,* 196 Pa. 107, 46 A. 363. The rule exists not merely to remedy wrong but to prevent the possibility of it. In such circumstances the beneficiary has the option of timely election to take the benefit of the purchase: *Church v. Winton,* 196 Pa. 107, 46 A. 363; *Harris v. Silvis,* 86 Pa. Super. Ct. 222. The election here was in time, and the right was asserted by proper parties (cf. *Tracy et al. v. Central Trust Co.,* 327 Pa. 77, 192 A. 869).

The remaining question is how much time should be given to the beneficiaries to reimburse the bank for its purchase of the mortgage, assuming always that the interest be paid and the other terms of the mortgage complied with. While in some cases that may be a question of difficulty, we think the parties have themselves specified in their agreement what a reasonable time should be for the purposes of this case. They agreed that the maturity of the mortgage should be extended for three years from the date of the distribution. We think during the same period the bank should be restrained from foreclosing or disposing of the mortgage, unless to the parties interested in the estate, provided that the estate or parties interested continue to pay the interest and otherwise comply with the provisions of the mortgage.

In appeals numbers 38 and 39 the questions are presented by the bank's claim on fourteen notes, some made by decedent, and others by her son and endorsed by her. The court held the proof insufficient as to three, reducing the claim allowed to $35,887.30. Appellants contend the amount should be further reduced on two grounds: that the court erred in holding (1) that alterations on some of them were sufficiently explained, and (2) that notice and protest of others had been waived. Section 124 of the Negotiable Instruments Act, 1901, P. L. 194, 211, 56 PS section 276, provides, "Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided except as against a party who has himself made, authorized or assented to the alteration, and subsequent indorsers. . . ." The court accepted the evidence of the maker's assent to the apparent alteration before execution; the only question for review then is whether there was sufficient evidence. The assistant cashier, who was competent to testify (*Canon v. Pennsylvania Trust Co.*, 305 Pa. 422, 158 A. 173), gave evidence supporting the finding made by the court; we must therefore accept it: *Byrnes's Estate*, 325 Pa. 445, 188 A. 871. On some of the notes the

bank had made notations consisting of numbers and dates for convenience of record and bookkeeping. These notations were challenged as alterations of the obligation. We see no reason to differ from the conclusion reached.[3]

Coming to the waiver of demand and protest of the three notes the question is whether the evidence was sufficient to warrant the judge in finding that Mrs. Strickler had waived notice. The notes were demand notes made by Edgar E. Strickler to the order of Mary D.

---

[3] On this subject the learned judge said: "In considering the point here involved it must be borne in mind that the bank collected the interest on all 'time' notes in advance. The numbers and dates appearing in the lower left-hand corner of the exhibits are used in connection with the 'Discount Ledger' of the bank. These numbers and dates have no connection whatever with the regularity and legality of the obligation of the decedent. The obligation would be complete without any writing whatever in the lower left hand corner of the note, and such memoranda as is placed there for the convenience of the bank neither adds to or detracts from the obligation which decedent undertook. These alterations do not change the due date or the time of payment. The due date was fixed when the note was dated and the period that the obligation was to run was inserted in the note, which then became a mere matter of calculation to determine from these two items when the obligation became due. That the data contained in the lower left hand corner of the exhibits are merely memoranda, and any alteration of the same has never been considered as material by the courts of Pennsylvania, seems to have been settled beyond all doubt as far back as 1861, when in *Struthers v. Kendall & Son*, 41 Pa. 214, 229, the court, after deciding that the noting of the residence of maker and endorsers after their names is not a material alteration, said: 'As well might the customary file-mark indicating when the paper falls due, be called a material alteration.' The only possible conclusion that we can draw from the foregoing is that if the file-mark or notation of due date on the note is a mere memoranda, that any changes or alterations thereof are immaterial and do not affect the obligation."

The same conclusion is reached in *Clem v. Chapman* (Tex. Civ. Ap.), 262 S. W. 168; *A. L. Harrington Co., Inc., v. Barron* (La.), 131 So. 503; *Hellar v. National City Co.*, 171 Wash. 585, 18 P. (2d) 480.

Strickler and endorsed by her. They were dated respectively November 15, 1926, May 12, 1928 and August 19, 1929. A witness who had been the bank's note-teller from 1925 until the fall of 1929, testified that he was familiar with the transactions. He was asked why they were not presented for payment or protest made and said "Because of the fact that in conversation with me and in my presence with Mrs. Strickler we regarded these notes as continuing obligations and therefore did not make any demand for payment. Q. You spoke of conversations; what were these conversations, Mr. Moyer, which led you to consider these obligations as continuing obligations? A. Well, as my memory serves me several times she came in and in conversations with me told me that as soon as the real estate market went up she would get rid of some of the real estate that was back of these notes and pay off the notes. . . . Q. You may state, Mr. Moyer, whether or not the notes identified as Exhibits Nos. 11, 12 and 13 which have been shown to you were referred to in these conversations? A. They were [the rest of this answer was stricken out]. Q. Just state to us what her conversations with you were as far as you can recall with reference to these Exhibits Nos. 11, 12 and 13? Miss Graubert: This is objected to. The Court: It is all under the reservation. A. Several times when she was in the bank, usually about the time the interest fell due on all of these notes, they were on demand, we would send interest statements to her and she would bring the interest statements in and she would then ask—I remember one time especially, she asked my superior officer and myself if we couldn't do something with Edgar Strickler in order to line him up and have him start paying on these obligations, that he was always in need of money and she feared she would have to pay them, and as long as he was going along as he was she knew there was no chance of his paying them off. I know of two different occasions she asked that we do something to get him in and start paying on these obligations."

The notes have endorsed on them payments of interest with the dates when paid and the dates to which paid. On exhibit No. 11, there are four such entries showing payment of interest to August 15, 1929; on exhibit No. 12 there are three showing payment of interest to July 1, 1930, and on exhibit No. 13, there are eleven showing interest paid to July 1, 1930. Mrs. Strickler died October 16, 1930. The learned judge said: "In view of Mrs. Strickler's financial burdens heretofore enumerated, she could see no way of paying off her obligations only by selling some of her real estate 'as soon as the real estate market went up.' We do not have the least doubt but that Mrs. Strickler, by her conduct and the expressions quoted, meant the bank to understand she waived her right to have demand made upon her and Edgar's notes protested, and that the bank was justified in its interpretation." We think the evidence was sufficient and must accept the finding made. On the subject of waiver, as related to the evidence in the record, see *Barclay v. Weaver,* 19 Pa. 396; *Annville National Bank v. Kettering,* 106 Pa. 531; *Valley Nat. Bank v. Urich,* 191 Pa. 556, 43 A. 354; *Burgettstown National Bank v. Nill,* 213 Pa. 456, 63 A. 186; *Doak v. Levy,* 126 Pa. Superior Ct. 581, 191 A. 662.[4]

In the last section of appellants' brief a minor point is made which, if we understand it, requires further consideration of the decree by the learned court below. In the decree "the Executors are further directed to assign, transfer and set over said bond and mortgage in the amount of $37,336.60, with interest thereon at six per cent per annum from February 18, 1932, to the following creditors in the amounts set opposite their names

---

[4] See also *O'Bannon Co. v. Curran,* 129 App. Div. 90, 113 N. Y. S. 359; *Bessenger v. Wenzel,* 161 Mich. 61, 125 N. W. 750; *Sweetser v. Jordan,* 216 Mass. 350, 103 N. E. 905; *Hansen v. Bowers,* 208 Iowa 545, 223 N. W. 891; *Morgan v. Huffman,* 76 Mont. 396, 247 Pac. 326; *Linthicum v. Bagby,* 131 Md. 644, 102 A. 997; *Foundry Mfg. Co. v. Farr,* 96 Vt. 382, 119 A. 885.

. . . [which follow]." The mortgage is that dated February 18, 1932, given by the Strickler-Miller Corporation to the executors of decedent's estate in the sum of $46,287.87, as stated in the beginning of this opinion. The amount was reduced by the reduction of the creditors' claims presented at the audit. In appellants' brief they complain of the allowance of interest from February 18, 1932. They say "No explanation is made as to why this date was chosen. The question of interest on the amount of the mortgage lien was never discussed throughout the trial, and the item was added by the court after the record had been remitted from this court for correction against the objections of counsel for the guardian *ad litem*. We submit, therefore, that the mortgage lien, which is available for distribution to creditors, does not include interest on the amounts due, but only such amounts as the court should find owing by the estate to the creditors."

Among the persons to whom interests in the mortgage are directed to be assigned are several persons whose claims did not come into existence until long after February 18, 1932. They would of course not be entitled to interest from February, 1932. We have no doubt this fact was overlooked through inadvertence but it is an error that may be corrected. On the return of the record the parties should have opportunity to be heard on the subject in order that proper adjustment may be made.

We do not understand the argument concerning Dorothea Miller's share. The sum referred to seems to be the subject of an award in the 5th paragraph of the decree, but it is sufficient now to say that she is not an appellant.

In No. 37 the record is remitted to enable the court to enter a decree not inconsistent with this opinion, costs of this appeal to be paid by the bank.

In Nos. 38 and 39 the record is remitted for modification in the respect indicated, otherwise the decree is affirmed; costs to be paid out of the fund for distribution.