## Chalupiak, Appellant, *v.* Stahlman.

84

Argued March 21, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Earl J. Schermerhorn,* with him *Smith & Schermerhorn,* for appellants.

*Richard A. McConnel,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 27, 1951:

Was the business relationship between the defendant, H. C. Stahlman and plaintiff, Paul Chalupiak of such a nature and character which required of defendant the duty of loyalty, fidelity and fair dealing and which precluded defendant from acquiring and enforcing an adverse title to real estate against plaintiff? The court below ruled that defendant owed no such duty and dismissed the bill. This appeal followed.

The commissioners of Beaver County purchased at the county treasurer's tax sale a tract of land assessed as "land of James Moore Heirs". There was no description by metes and bounds but eventually it was established that the area consisted of 54.088 acres. Adjoining this land was another tract which was also owned by the county commissioners. Plaintiff was desirous of acquiring the land formerly owned by the "James Moore Heirs" and purchased the same from the commissioners. At the suggestion of the commissioners plaintiff employed a registered engineer to prepare a survey and plan of the tract and he also had the title examined and approved by a lawyer. The survey and plan was inaccurate because it included approximately 30 acres of land not a part of the "Moore tract". Plaintiff, under the mistaken information thus furnished, was of the opinion that he owned 80 acres of land which he proceeded to subdivide into building lots and sold some of them to purchasers by deeds with general warranty of title. Such conveyances included part of the 30 acres of land to which plaintiff had no title.

It is obvious from his testimony that plaintiff is an unlettered man. Defendant, H. C. Stahlman, on the contrary, in addition to his employment in an adjacent factory or mill, was a justice of the peace and also the tax collector. He maintained a business office

with a paid assistant. For fees he drew wills, contracts and other papers, took affidavits and acknowledgments and prepared income tax returns. Defendant was obviously a type of country squire, of some education, whom people of the area consulted for many purposes and in whom doubtless his clients reposed a great confidence.

Sometime in 1945, plaintiff called at defendant's office and requested him to prepare a deed for a subdivision of the land which plaintiff had sold to Adam Adamaitas. Plaintiff brought with him a sketch or plan prepared by his engineer. Defendant examined the plan and concluded that the land proposed to be conveyed did not appear to be part of the "Moore Heirs" tract. Defendant asked plaintiff: "Are you sure that you own this ground?" Plaintiff replied that his engineer had drawn the plan and that his attorney informed plaintiff that he had good title. Defendant did not prepare the deed to Adamaitas and plaintiff employed an attorney for that purpose. However, from July 7 to September 15, 1945, defendant prepared four other deeds for such subdivisions, at plaintiff's request, from the engineer's survey. Defendant received $5.00 for each deed except one for which he received $3.00. Title to some of the land purported to be conveyed in these four deeds, as above stated, was then in the commissioners.

In July, 1946 plaintiff brought to defendant a petition to the commissioners to validate title to plaintiff's land for the purpose of acknowledgment. Defendant read to plaintiff the description of the land described in the petition and showed plaintiff on the borough map that the description indicated that plaintiff did not own the land for which he petitioned to have his title validated. As other errors appeared in the petition, it was not *then* acknowledged. Defendant informed plaintiff that the land to which title was in question was

advertised for sale by the Beaver County Commissioners. Subsequently, on November 27, 1946, the acknowledgment to the petition was taken by defendant and filed March 5, 1947. *When plaintiff brought his petition to defendant on November 27, 1946 for acknowledgment, defendant did not inform plaintiff that defendant had already purchased the land in question.*

On August 28, 1946, *defendant* had purchased part of the property adjoining the "Moore Heirs" property *as agent for his sister* who resides in Asheville, North Carolina. On February 26, 1947, defendant purchased another portion of adjoining property in the joint names of himself and his sister. It was this land, or a portion of it, which defendant purchased but which plaintiff had mistakenly considered to be his own and had conveyed to the four individuals as stated above. The court below found that any information obtained by defendant: ". . . as to ownership of land in Baden, was not secured by him from plaintiff. [Defendant] had such information before [plaintiff] came to him to prepare deeds. [Defendant] brought this information to the attention of [plaintiff] on several occasions. [Plaintiff], relying on advice of his engineer and counsel, refused to heed the information given by Stahlman [defendant]."

The fact that defendant, through borough plans, had knowledge of the ownership of lands in the borough is not controlling. Such maps or plans were available to all. It is, however, of paramount importance that—accepting such judicial finding of fact—it was plaintiff's request to defendant to draw a deed which caused the defendant, in examining the maps and plans of the borough, to recognize the fact that plaintiff's proposed transfers included land to which he had no title.

In the testimony it appears that defendant also prepared plaintiff's income tax returns. Defendant stated

in this connection that "[defendant] wasn't even sure that that land didn't belong to [plaintiff], when [defendant] bought it." The issue upon which this case revolves is the *capacity* in which defendant acted when he performed services for plaintiff. This in turn depends upon the *nature* and extent of the services rendered by defendant.

At the outset, it must be conceded that if all that defendant did for plaintiff was to act as a stenographer or clerk to fill in blanks in a deed form, defendant would not assume the duties and liabilities of a conveyancer. It is obvious, however, that defendant was employed as more than a stenographer or typist. While perhaps defendant was not acting as a conveyancer, with all the duties and liabilities of a lawyer in such a field: Ladner's Real Estate Conveyancing Vol. 2, p. 497; *LaBrum et al. v. Commonwealth Title Company*, 358 Pa. 239, 56 A. 2d 246, yet the testimony is clear that he was more than a mere clerk and stenographer. He was plaintiff's agent and confidential adviser. Ordinarily it is the grantee who is put to the expense of preparing the deed and searching the title, although in some counties the custom is the reverse: Ladner's Real Estate Conveyancing Vol. 2 sec. 204 p. 546 et seq. But in any event the plaintiff, the grantor, in this case undertook to have the deed drawn to *his* buyer or grantee. It was for this purpose plaintiff employed defendant. This made the defendant the plaintiff's agent. Restatement, Agency, sec. 1, defines an agency relationship as follows: "(1) Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Here defendant acted, at plaintiff's request and on plaintiff's behalf, in drawing the deeds in question, subject to plaintiff's control. Because of his knowledge as tax collector and as an agent

or conveyancer, he was aware either that plaintiff had no title whatever to the 30 acres or at least plaintiff's title was doubtful. Defendant secured, *during the course of his service to plaintiff*, the knowledge that plaintiff was attempting to convey land which plaintiff did not own. *It was this knowledge that defendant utilized against the interests of plaintiff.* Defendant, on the basis of this knowledge, went to a commissioners' sale and purchased the land which he knew or suspected that plaintiff mistakenly thought he had already validly conveyed to others. It is manifest that had plaintiff never dealt with defendant the latter would never have been led to purchase the land in question. Defendant was no chance purchaser. True, defendant expressed doubt to plaintiff concerning the validity of his title and also told plaintiff that the property had been exposed for sale by the commissioners. *What defendant failed or omitted to inform plaintiff was that defendant intended to bid at the sale in his own behalf and later to inform him that he had actually purchased the land.* It is to be particularly observed that the purchase by defendant, either for himself, as agent for his sister who lived in Asheville, North Carolina, or for himself and his sister, was not a purchase by a *bona fide* buyer but was for the sole purpose of requiring the plaintiff or his grantees to purchase defendant's interests at a price. *Before defendant bought the real estate he was fully aware that some of plaintiff's grantees had made valuable improvements upon the land and others had commenced building thereon.* It is a transparent attempt by defendant to profit through knowledge obtained from one who had employed him, either as agent, scrivener, conveyancer or combinations thereof. Defendant's action is comparable to what is commonly known in the Orient as a "Squeeze". If title was defective plaintiff would be liable to his buyer upon his warranty in the deed (prepared by defendant) and

if plaintiff refused or was unable to comply with his warranty, the plaintiff's grantee would be obliged to pay defendant or lose his property by ejectment. Defendant violated the duty of loyalty and fidelity he owed to plaintiff. In Restatement, Agency, sec. 395, it is stated: "Unless otherwise agreed, an agent is subject to a duty to the principal not to use . . . information . . . acquired by him during the course of or on account of his agency . . . to the injury of the principal, on his own account . . . although such information does not relate to the transaction in which he is then employed, . . ."

Comment a reads: ". . . The agent also has a duty not to use information acquired by him as agent or by means of opportunities which he has as agent to acquire it . . . for any purpose likely to cause his principal harm . . . although it is information not connected with the subject matter of his agency.." Cf. *Hockenbury v. Carlisle,* 5 W. & S. 348; *Hill v. Frazier,* 22 Pa. 320; *Henry v. Raiman,* 25 Pa. 354.

It is not of controlling importance that defendant utilized information which related to defect in *title.* True, defendant was not employed to search *title* but to prepare or draw a deed. However, this Court, speaking through Justice SHARSWOOD, stated in *Smith et al. v. Brotherline,* 62 Pa. 461, 469, that "The relation between him and his client is confidential, and whether he acts upon information derived from him or from any other source, he is affected with a trust." See Restatement, Agency, sec. 395, supra, where it is stated that an agent cannot use information acquired by him during the course of his agency to the injury of the principal ". . . although such information does not relate to the transaction in which he is then employed." It is important that a full disclosure of information to the conveyancer or agent be required.

Defendant, seeking to avoid the consequences of his acts, maintains that since he fully warned plaintiff that his title was doubtful and fully informed plaintiff of the tax sale where defendant purchased the land in question, he is therefore relieved of his fiduciary obligations to plaintiff. We do not agree. It would defeat the very purpose of the rule to permit defendant, having learned during his service to plaintiff of a defect in plaintiff's title, to give plaintiff full warning that *he* was going to take advantage of the defect. It could easily be that even though plaintiff or his grantee were present at the commissioners' sale, that defendant could bid up the price to a point where plaintiff would be required to settle upon defendant's terms. *Galbraith v. Elder,* 8 Watts 81, announces the rule which, although speaking concerning an attorney-client relationship, is also here applicable. The court held that an attorney could not purchase an outstanding title to that of his client, p. 100: ". . . because public policy and the preservation of a sound state of morals, as well as of the inviolable confidence which the law is ever solicitous to maintain between counsel and client, all combine in prohibiting counsel, after he has been consulted in respect to a claim which his client may have to land, *or anything else,* be it good or bad, from purchasing an outstanding title to it, either from the state or any other person, *without the express consent of his client."* (Emphasis supplied) The fact that plaintiff was told by defendant that the disputed lands were advertised for sale by the county commissioners does not constitute express consent on the part of plaintiff. Had defendant informed plaintiff that he, the defendant, intended to go to the sale to purchase this property and *then* plaintiff indicated his consent, of course, defendant would have then prevailed. But this was not the case.

It is true that in *Galbraith v. Elder,* supra, the court stated that *if it were possible* for counsel to purchase an outstanding title in opposition to that of his client, that the burden would be upon counsel to show he notified his client of the defect and gave him time to protect it, but the court also stated that it is *not* possible for counsel to so act.

Even if we did not attribute to defendant any conscious effort to defraud or take undue advantage of plaintiff, such a transaction cannot stand. It is said in *Cleavinger v. Reimar,* 3 W. & S. 486, it is not on the ground of fraud, but upon the principles of public policy that transactions similar to the present are prohibited.

Katherine Chalupiak, wife of Paul Chalupiak, is necessarily a party plaintiff, and Helen S. Wright, sister of H. C. Stahlman, is likewise a necessary defendant in the facts of this case.

Decree reversed with direction to the court below to enter a decree in accordance with the prayer of the bill.

---

Dissenting Opinion by Mr. Justice Bell:

I very strongly dissent from the majority opinion's summation of the facts and its conclusions of law. I cannot find nor could the Chancellor who saw and heard the witnesses, nor the court en banc, any fraud, actual or legal, and certainly no confidential relationship. It is by now hornbook law that "findings of fact by a Chancellor who saw and heard the witnesses, especially when approved by the court en banc, have the force and effect of a verdict of a jury and will not be disturbed on appeal, if supported by adequate evidence": *Roth v. Hartl,* 365 Pa. 428, 75 A. 2d 583; *Christy v. Christy,* 353 Pa. 476, 46 A. 2d 169; *Barrett v. Heiner,* 367 Pa. 510, 80 A. 2d 729.

The majority do not challenge or directly dispute the Chancellor's findings of fact; instead they ignore them and base their conclusions of law upon an erroneously assumed state of facts, the most important of which are diametrically opposed to the findings of the Chancellor or have absolutely no evidence to support them. Moreover, even if it be assumed, contrary to the facts, that the defendant was a trustee or fiduciary *the majority's conclusion of law flies in the teeth of a dozen decisions of this Court* (as we shall subsequently demonstrate).

Plaintiffs filed a Bill in Equity to compel defendants to convey to plaintiffs certain land which defendants had purchased at a public sale, *of which plaintiffs had actual and constructive notice, and with which and over which defendants had no connection or control.*

We can best demonstrate how far afield the majority have wandered and how erroneous is their conception and summation of the facts *by quoting the Chancellor's findings of fact verbatim.*

"1. The Beaver County Commissioners, on June 13th, 1923, purchased at treasurer's sale, a tract of land containing 54.088 acres, known as land of James Moore Heirs, situate in the Borough of Baden, in this county.

2. In 1944, plaintiffs desired to purchase the Moore Heirs tract of land, and upon inquiry of the Beaver County Commissioners, were advised to employ an engineer to make a survey of the land.

3. *Plaintiffs employed D. C. Washburn, a registered engineer,* to make a survey of the Moore Heirs tract of land.

\* \* \* \* \* \* \*

---

\* Italics throughout, ours.

5. The survey which Washburn made was not a correct survey of the James Moore Heirs tract of 54.088 acres and erroneously included 30 acres of land from some of the tracts . . .

6. On January 26, 1945, plaintiffs purchased from the Beaver County Commissioners 54.088 acres of land in Baden, and known as land formerly of James Moore Heirs.

7. Before purchasing the land from the commissioners, plaintiffs were not advised by counsel, and they did not have an examination of title made.

8. Plaintiffs were erroneously of the opinion that they had purchased the 80 acre tract shown by the Washburn survey.

9. *Pursuant to plaintiffs' direction, Washburn subdivided* the 80 acre tract of land so that deeds could be prepared for delivery to prospective purchasers. The subdivision included some land to which plaintiffs did not have title.

10. In 1945, Paul Chalupiak came to the office of defendant, Stahlman, with a sketch made by Washburn, and requested Stahlman to prepare a deed to Adam Adamaitas, et ux. Stahlman examined the sketch, and concluded that *the land did not appear to be part of the Moore Heirs tract.* Stahlman asked Chalupiak whether or not he was sure he owned the land, and Chalupiak replied that Washburn had made an error and thereafter had drawn a new map.

11. *Later Chalupiak informed Stahlman that his lawyer said his title to the land was good.*

12. In the spring of 1946, Stahlman told Chalupiak that Chalupiak did not have title to the lands in question.

13. June 19th, 1945, plaintiffs sold a tract of land containing 2 acres to Adam Adamaitas, et ux. The *deed for this tract was prepared at plaintiff's request, from*

*Washburn's survey, by Harold L. Roth, Esq., an attorney.*

14. July 7th, 1945, plaintiffs sold a tract of land containing 2 acres, more or less, to Julian Tabin. *The deed for this tract was prepared by defendant, Stahlman,* at plaintiffs' request, *from Washburn's survey,* and he received *$3.00* compensation for his services.

15. August 17th, 1945, plaintiffs sold a tract of land containing 5.2 acres, more or less, to Thomas Hunchar. This deed was prepared by defendant, Stahlman, at plaintiffs' request from the *Washburn survey,* and he received *$5.00* compensation for his services.

16. September 5th, 1945, plaintiffs sold a tract of land containing 2 acres, more or less, to Lawrence Tabin et ux. This deed was prepared by defendant, Stahlman, at plaintiffs' request, from the *Washburn survey,* and he received *$5.00* compensation for his services.

17. September 15th, 1945, plaintiffs sold a tract of land containing 1 acre, more or less to Frank Misas. This deed was prepared by defendant, Stahlman, at plaintiffs' request *from the Washburn survey,* and he received *$5.00* compensation for his services.

18. Title to some of the land purported to be conveyed in the deeds referred to in findings of fact 13, 14, 15, 16, and 17 was then vested in the Beaver County Commissioners, and not as plaintiffs thought in plaintiffs, who were grantors in the deeds heretofore mentioned.

19. At the time Stahlman prepared the deeds heretofore mentioned, he was a duly elected, qualified and acting justice of the peace of the borough of Baden.

20. *Stahlman was not an agent for plaintiffs in the sale of any land, he had no dealings with any purchasers and he acted for plaintiffs at their request, only in drawing the deeds and taking plaintiffs acknowledgment to the deeds.*

21. *Defendant, Stahlman, did not act for plaintiffs in a fiduciary relationship, nor as agent or employee with relation to the sale or attempted sale of land.*

22. In July, 1946, Chalupiak brought to Stahlman a petition to validate title to his land for the purpose of swearing to it. Stahlman read the description to Chalupiak, and *showed Chalupiak on the borough map of Baden that the description and map indicated that Chalupiak did not own the land.*

23. *On two occasions,* at Stahlman's office, Stahlman told Chalupiak that he did not have title to the land, and *Chalupiak replied that two lawyers and one surveyor said he did, and he thought they knew more about it than Stahlman.*

24. *Stahlman did not deceive Chalupiak as to any fact relative to the title to the land. He told Chalupiak, on several occasions, that he was of the opinion that the land did not belong to Chalupiak.*

25. Chalupiak acted throughout as agent for his wife, Katherine Chalupiak.

26. Stahlman acted throughout as agent for his sister, Helen S. Wright.

27. *Before Stahlman purchased any of the land in question, he* informed Chalupiak that the land in question was listed for sale by the *Beaver County Commissioners.*

28. August 28th, 1946, Stahlman purchased the Alciphran Pier tract of land as agent for Helen S. Wright, *at public sale, after due advertisement.*

29. On February 26th, 1947, Stahlman bought the Mrs. M. A. Machesney tract of land in his name, and the name of Helen S. Wright, from the Beaver County Commissioners, *at public sale, after due advertisement.*

30. On February 26th, 1947, Stahlman bought from the Beaver County Commissioners, *at public sale, after due advertisement,* the L. D. Machesney tract of land, in his name, and the name of Helen S. Wright.

31. On August 27th, 1947, Stahlman bought from the Beaver County Commissioners, *at public sale, after due advertisement, the Delia Moore Heirs tract of land.*

32. *Chalupiak had notice before Stahlman purchased any land* that the property would be sold by the Beaver County Commissioners. *He had actual notice from Stahlman and he had constructive notice by the advertisement of the Commissioners sales.*

33. *Any information secured by Stahlman as to ownership of land in Baden, was not secured by him from Chalupiak. He had such information before Chalupiak came to him to prepare deeds.* He brought this information to the attention of Chalupiak on several occasions. *Chalupiak, relying on advice of his engineer and counsel, refused to heed the information given by Stahlman."*

The Court below in its opinion said: "The evidence amply supports the conclusion that when plaintiffs requested defendant to prepare the first deed, defendant refused. He assigned as a reason that he was of the opinion that plaintiffs did not own the land. He prepared the other deeds *after plaintiffs told him that plaintiffs' engineer and lawyer assured plaintiffs that plaintiffs' title to the land was good.* Several times thereafter defendant called plaintiffs' attention to the fact that the title was questionable. Defendant drew deeds from a blue print and information submitted by plaintiffs. *There is no evidence to support a conclusion that at any time did plaintiffs rely on any representation by defendant relative to ownership of, or title to the land. All the evidence is to the contrary. Plaintiffs did not seek advice of any kind from defendant. On every occasion they refused to heed the warnings gratuitously offered by defendant.*

"Plaintiffs cannot have an order for conveyance of the land in this case for another important reason.

*Defendant had no control over, or any part in bringing about the sale of the land which he purchased.* The land was acquired by the County Commissioners at Treasurers Sale for unpaid taxes. The commissioners sold the land which defendant purchased at public sale after due advertisement. *Before the sale,* defendant informed plaintiffs that the specific land would be sold by the commissioners at public sale *on a definite date.* Plaintiffs could have attended the sale and purchased the land which they needed to make title to the property which they attempted to convey. *They elected to rely on advice of their attorney and engineer and they did not attend the sale.* There is no evidence that they relied on any advice of defendant in regard to their title to the land."

In the light of the Court's findings of fact and discussion which were clearly supported by the overwhelming evidence, it is clear as crystal that whatever knowledge defendant had with respect to the property was never obtained from the plaintiffs; that he gratuitously informed plaintiffs that he did not think they had a good title to the property; that he acted only as a conveyancer receiving the colossal compensation of $3.00 or $5.00 for each deed; that he informed plaintiffs of the Commissioners pending sale of the property before he purchased it; *that the plaintiffs did not rely on defendant or seek his advice but relied upon the advice of their attorney and engineer instead of the defendant's opinion;* that the sale was a public sale, after due advertisement, of which the plaintiffs had actual as well as constructive notice; *that the sale was not under the control of the defendants nor were they instrumental in bringing it about,* nor did they have any connection whatsoever with it. In the light of these facts the Court below naturally and necessarily found that defendant occupied no confidential relationship to the plaintiffs.

Of course defendant was not a trustee or fiduciary, but even if he had been it would still be impossible to sustain the decision of the majority in this case. In *MacDougall v. Citizens National Bank*, 265 Pa. 170, 108 A. 608, Mr. Justice, later Chief Justice FRAZER thus expressed the well recognized rule of Pennsylvania (page 173) : ". . . the sole contention of plaintiffs being that a trust resulted as to the realty. . . . The [Sheriff's] sale, however, was not brought about or controlled by either defendant. The general rule is that if a trustee becomes the purchaser of property at public sale brought about or in any manner controlled by him, he will be presumed to buy and hold for the benefit of the trust. *But this rule does not apply where the trustee is without control over the sale and is not instrumental in bringing it about. In the latter case he may bid and become the purchaser of the property free from any trust on his part*: Calvert v. Woods, 246 Pa. 325, 328, and cases cited." In Hunter Penna. Orphans' Court Commonplace Book (Vol. I) Fiduciaries §5 (b) page 533, the law is thus stated: *"Rule forbidding trustee to purchase trust property does not apply where the trustee is without control over the sale and is not instrumental in bringing it about*: Chorpenning's Ap., 32 Pa. 315, Bruner v. Finley, 187 Pa. 389, Connor v. Gibbons, 228 Pa. 617, Calvert v. Woods, 246 Pa. 325, MacDougall v. Citizens Bank, 265 Pa. 170."

This principle is reiterated in *Kelley's Estate*, 297 Pa. 17, 21, 146 A. 260, and was recently recognized by this Court, speaking through Mr. Justice LINN, in *Strickler's Estate*, 328 Pa. 145, 150, 195 A. 134.

While it is unnecessary, we shall refer to other statements in the majority opinion in order to further demonstrate its fallacy and errors.

The majority opinion pointed out that defendant Stahlman, in addition to his employment in a mill, was a Justice of the Peace and a Tax Collector and that he

took affidavits and acknowledgments and prepared Income Tax Returns; and that he prepared several income tax returns (he prepared one) for plaintiff and prepared (for $5. apiece) and took his acknowledgment to 4 deeds to a part of the land in controversy. From these facts the majority *concludes that he was plaintiffs' agent and confidential advisor.* These conclusions are diametrically opposed to the evidence and to the findings of the Chancellor. *All* of the evidence and findings demonstrate that the defendant was not the plaintiffs' agent or confidential advisor (see particularly findings Nos. 20 and 21). *He was not consulted by plaintiff* about the purchase of the property, or about the ownership of or title to the property, or about the sale of the property; his advice was not sought nor his warnings taken; he had no dealing with any purchasers; nor was he employed to search title, but only to draw four deeds from the survey given him by the plaintiff, and to take plaintiff's acknowledgment to these deeds. *Whatever information defendant acquired as to the ownership of the land was never secured by him from plaintiffs and plaintiffs never relied upon defendant* or on defendant's gratuitous information, but on the advice of plaintiffs' counsel and engineer (see particularly finding No. 33). How then could a confidential relationship arise? We can easily imagine the ridicule and scorn with which a lawyer would have showered plaintiffs if they had taken the opinion (or doubt) of a conveyancer, who received the colossal fee of $5.00 ahead of and in preference to the opinion and advice of plaintiffs' lawyer and engineer. *Defendant never made any false or fraudulent statement* (see particularly finding No. 24) ; on the contrary, defendant's warning plaintiffs of his doubt about their title and advising them of the pending Commissioners sale were, we believe, the actions of an honest man instead of that of a cheat or a defrauder. The Chancellor specifically found, as we have hereinabove set

forth, and the evidence was overwhelming and uncontradicted that *plaintiff told defendant he was relying upon the advice of his lawyer and engineer instead of the defendant.* To hold under these facts, that defendant Stahlman occupied a confidential relationship to the plaintiffs with regard to the land which defendant Stahlman subsequently purchased at public sale seems so far fetched as to be incomprehensible.

The majority also say: "Defendant secured, during the course of his service to plaintiff, the knowledge that plaintiff was attempting to convey land which plaintiff did not own". [Defendant and anyone else interested could have readily secured this information from the recorded deeds.] "It was this knowledge that defendant utilized against the interests of plaintiff. Defendant, on the basis of this knowledge, went to a commissioners' sale and purchased the land which he knew or suspected that plaintiff mistakenly thought he had already validly conveyed to others." [The majority have no right to find or conclude, without any evidence whatsoever to substantiate it, that the defendant utilized against the plaintiffs this knowledge which he could readily have obtained from the public records, *or that this induced him to go to the Commissioners' sale and buy in the property.*] "It is manifest that had plaintiff never dealt with defendant the latter would never have been led to purchase the land in question." *This is a ridiculous non sequitur, and is unsupportable by any evidence.*

Although the defendant, when he bought the property, notified plaintiffs' grantees in writing that he owned the property and they shouldn't build thereon, the majority accuses the defendant of a "Squeeze" and further said: "It could easily be that even though plaintiff or his grantee were present at the commissioners' sale, that defendant could bid up the price to a point where plaintiff would be required to settle upon defendant's

terms." The answer to that surmise is that it is equally applicable to any and every other prospective purchaser at the Commissioners' sale.

The majority also attempt to make this conveyancer the equivalent of a lawyer or trustee and, unsupported by any authority, apply to him the fidelity which a lawyer owes to a client, completely overlooking the indisputable fact that defendant Stahlman was not a lawyer or trustee, that he was engaged only to draw a deed and not even to search title, and that plaintiffs employed their own lawyer and engineer *and relied exclusively on them and their advice.* Even if this defendant were a trustee or fiduciary, *which he was not, he still had a lawful right under a dozen (above mentioned) decisions of this Court to purchase this land at a public sale over which he had no connection or control.*

I would affirm the Decree of the Court below on the very able opinion of Judge MORGAN H. SOHN.